# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

_____

)
AMERISURE INSURANCE COMPANY    )
and AMERISURE MUTUAL    )
INSURANCE COMPANY,    )
    )
      Plaintiffs,    )
    ) **CASE NO.: 1:15-cv-235-MW-GRJ**
   vs.    )
    )
THE AUCHTER COMPANY, ARCH    )
INSURANCE COMPANY,    )
LANDMARK AMERICAN INSURANCE    )
COMPANY, TSG INDUSTRIES, INC.,    )
and B & B OF DUVAL    )
COMPANIES, INC.,    )
    )
      Defendants.    )
_____ )

## <u>AMERISURE INSURANCE COMPANY'S AND AMERISURE MUTUAL INSURANCE COMPANY'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF</u>

Now come Plaintiffs, AMERISURE INSURANCE COMPANY and

AMERISURE MUTUAL INSURANCE COMPANY (collectively referred to

herein as "Amerisure"), by and through their undersigned counsel, and hereby set

forth their First Amended Complaint for Declaratory Judgment and Other Relief[1]

_____

[1] Amerisure's Complaint for Declaratory Judgment and Other Relief [D.E. 1] is amended pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), which states in pertinent part: "A party may amend its pleadings once as a matter of course within

1

against Defendants, THE AUCHTER COMPANY ("Auchter"), ARCH INSURANCE COMPANY ("Arch"), LANDMARK AMERICAN INSURANCE COMPANY ("Landmark"), TSG INDUSTRIES, INC. ("TSG") and B & B OF DUVAL COMPANIES, INC. ("B & B") (herein collectively "Defendants"). In support thereof, Amerisure alleges as follows:

## I.   NATURE OF ACTION AND RELIEF SOUGHT

1.   This action seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

2.   This is a civil action brought by Amerisure seeking a declaration that it owes no duty to indemnify Auchter and Arch, as alleged assignee of Auchter under Commercial General Liability (herein "CGL") insurance policies and Umbrella Liability (herein "Umbrella") insurance policies (collectively referred to herein as "Amerisure Policies") issued by Amerisure to Auchter in connection with a Final Judgment entered in the underlying action captioned *Riverside Avenue Partners, Ltd. v. The Auchter Company*, Case No.: 16-2010-CA-006433, filed in the Circuit Court of the Fourth Judicial Circuit in and for Duval County,

---

… (B) if the pleading is one to which a responsive pleading is required . . . 21 days after service of a motion under Rule 12(b) . . . ., whichever is earlier". No party has filed an Answer in this matter. Amerisure's First Amended Complaint is filed within 21-days of Landmark American Insurance Company filing its Motion to Dismiss or, in the Alternative to Transfer, which was filed on December 2, 2015 [D.E. 20].

Florida (herein "Underlying Action") and/or in connection with Arch's settlement with Riverside Avenue Partners, Ltd. ("RAP"), *see* Para. 48, *infra.*  Additionally, Amerisure seeks reimbursement from Landmark of all attorneys' fees, costs and expenses (herein "defense costs") paid in connection with defending Auchter in the Underlying Action.

3.       There is an actual, present and *bona fide* controversy between the parties with respect to whether Amerisure is required to indemnify Auchter and/or Arch, as alleged assignee of Auchter in connection with the Final Judgment issued in the Underlying Action.  *See* the Final Judgment From Non-Jury Trial ("Final Judgment") attached hereto as **Exhibit "A",** and/or in connection with Arch's settlement with RAP, *see* Para. 48, *infra*.  Amerisure denies it owes an indemnity obligation to Auchter and/or Arch for the amounts set forth in the Final Judgment and/or Arch's settlement, as set forth herein.

4.       There is an actual, present and *bona fide* controversy between Amerisure and Landmark in light of Landmark's acceptance of Auchter's defense in the Underlying Action and failure to honor its primary obligation to defend Auchter.  In light of Landmark's breach of its duty to defend, Amerisure, as an excess insurer, is entitled to full reimbursement of defense costs from Landmark along with interest and attorneys' fees for prosecuting this action.

5.       RAP is the plaintiff in the Underlying Action and was the owner of

property located at 501 Riverside Avenue, Jacksonville, Florida, for which it entered into a contract with Auchter for Auchter to act as contractor for construction of a 13-story commercial office building (the Everbank Plaza herein referred to as "the Project").

6.      Auchter is a defendant in the Underlying Action and was the contractor for construction of the Project at issue in the Underlying Action.

7.      Arch is a defendant in the Underlying Action and issued payment and performance bonds to Auchter in connection with the Project at issue in the Underlying Action.

8.      Amerisure requests that this Court declare the rights and obligations of the parties under certain insurance contracts pursuant to 28 U.S.C. § 2201, et seq., finding and declaring that Amerisure owes no coverage obligations to Auchter and/or Arch, as Auchter's actual or alleged assignee for the amounts set forth in the Final Judgment entered in the Underlying Action, and/or in connection with Arch's settlement with RAP, *see* Para. 48, *infra*. Further, Amerisure requests that this Court find and declare that Landmark, as Auchter's primary insurer, must reimburse Amerisure for all defense costs it paid in defending Auchter in the Underlying Action.

## II.   <u>PARTIES</u>

9.      At the time of the commencement of this action, Plaintiffs

4

Amerisure Insurance Company and Amerisure Mutual Insurance Company were insurance companies organized and existing under the laws of the State of Michigan with their principal place of business in Farmington Hills, Michigan.

10.     At the time of the commencement of this action, upon information and belief, Defendant Auchter was a Florida corporation whose principal place of business was located in Jacksonville, Florida.  On information and belief, Auchter was doing and transacting business in Florida, including the geographical regions that encompassed this United States District Court for the Northern District of Florida, including the Gainesville Division, at all times relevant hereto.

11.     At the time of the commencement of this action, upon information and belief, Defendant Arch is a Missouri corporation whose principal place of business is located in Jersey City, New Jersey.  Upon information and belief, Arch is licensed to engage in, and actively engages in, the business of selling insurance and transacting business in the State of Florida, including the geographical regions that are encompassed by the United States District Court for the Northern District of Florida, including the Gainesville Division.  *See e.g., Arch Insurance Company v. United States of America et al.,* Case No. 3:09-cv-00395 (N.D. Fla.); *Profast Supply, Inc. v Florida Framing, LLC et al.,* Case No. 2015-CA-2161 (Cir. Ct. Eight Judicial Cir., Alachua County, Florida).

12.    At the time of the commencement of this action, Defendant Landmark is, upon information and belief, an Oklahoma corporation whose principal place of business is located in Atlanta, Georgia.  Upon information and belief, Landmark is licensed to engage in, and actively engages in, the business of selling insurance and transacting business in the State of Florida, including the geographical regions that are encompassed by the United States District Court for the Northern District of Florida, including the Gainesville Division.  *See e.g., The Bartram, LLC v. Landmark American Insurance Co.*, Case No.: 10-cv-0028SPM-AK (N.D. Fla., Gainesville Division); *Colony Insurance Company, Landmark American Insurance Company, et al. v. Escambia County Board of County Commissioners,* Case No. 3:15-cv-00431 (N.D. Fla.) (admitting to jurisdiction and venue in this Federal District under 28 U.S.C. § 1391(b)(1)).

13.    Landmark has been joined because it is the insurer of TSG, a defendant in the Underlying Action who was found to be liable to Arch and Auchter for a portion of the Final Judgment in the Underlying Action.  Landmark has also been included in this action insofar as it accepted Auchter's defense in the Underlying Action, but breached its duty to defend Auchter.  Thus, Landmark is a required party to this action regarding what, if any, responsibility it has for the Final Judgment and its obligation to reimburse Amerisure for all defense costs it paid to defend Auchter.

6

14.     At the time of the commencement of this action, upon information and belief, Defendant TSG is a Georgia corporation whose principal place of business is located in Valdosta, Georgia.  Upon information and belief, TSG was, and is, transacting business in Florida, including, on information and belief, the geographical regions that are encompassed by the United States District Court for the Northern District of Florida, including the Gainesville Division.  TSG has been joined because it was found to be liable to Arch and Auchter in the Final Judgment entered in the Underlying Action, and thus is a required party to this action.

15.     At the time of the commencement of this action, upon information and belief, Defendant B & B is an inactive Florida corporation whose principal place of business was located in Jacksonville, Florida.  Upon information and belief, B & B was doing and transacting business in Florida, including on information and belief, the geographical regions that are encompassed by the United States District Court for the Northern District of Florida, including the Gainesville Division.  B & B has been joined because it was found to be liable to Arch and Auchter in the Final Judgment entered in the Underlying Action, and thus is a required party to this action.[2]

_____

[2] B & B's insurer, relative to the Project, is currently unknown.

7

## III.   JURISDICTION AND VENUE

16.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties, and because the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (c)(2), and (d), and N.D. Fla. Local Rule 3.1(B).

18.    Pursuant to 22 U.S.C. § 2201, this Court has the power to make binding declarations of the rights and obligations of the parties herein, and to adjudicate the dispute between the parties herein.

## IV.   BACKGROUND

### A.   The Project

19.    On September 21, 2005, RAP and Auchter entered into a contract, wherein Auchter was to construct the Project.

20.    In accordance with the contract, Arch issued payment and performance bonds as surety to Auchter, guaranteeing the performance of Auchter under the contract.

21.    The official date of commencement of the Project was July 14, 2005. Pursuant to the contract, Auchter agreed to achieve substantial completion of the Project by November 18, 2006.  The AIA Rider to the contract provided Auchter a

30-day grace period before delay damages accrued, which was not until December 18, 2006.

22.    Auchter subcontracted with TSG for work to be performed and completed at the Project (herein "TSG subcontract").  *See* **Exhibit "B"**.  The TSG subcontract required, in relevant part:

> THIS AGREEMENT made June 15, 2006, by an between THE AUCHTER COMPANY, 4804 Kerman Boulevard South, Jacksonville, Florida 32224, hereinafter called the CONTRACTOR, and TSG Industries Inc, 1616 James P Rodgers, Valdosta, GA 31601, hereinafter called the SUBCONTRACTOR witnesseth, that the CONTRACTOR and SUBCONTRACTOR for the consideration herein named agree as follows:
>
> *       *       *
>
> Article 4. The SUBCONTRACTOR agrees to complete the several portions and the whole of the work herein sublet in time not to delay job progress and the work of other trades, other subcontractors, the CONTRACTOR. Time is of the essence and all work to be performed under the contract shall be diligently prosecuted to conform with the requirements of the CONRACTOR.
>
> SUBCONTRACTOR indemnifies CONTRACTOR and holds it harmless for all liquidated or other damages incurred by CONTRACTOR to the Owner for any delay attributable to SUBCONTRACTOR.
>
> *       *       *
>
> Article 6.  Prior to starting work all required insurance shall be obtained from a responsible insurer, and satisfactory evidence shall be furnished to the CONTRACTOR that the SUBCONRACTOR has complied with the insurance requirements as outlined in Schedule F.
>
> The SUBCONTRACTOR shall be solely responsible for any injury or damage to persons or property resulting from any act or omissions of the

SUBCONTRACTOR in connection with the performance by it of the work covered by the Agreement and shall indemnify and hold the CONRACTOR and/or Owner harmless for any and all liability whatsoever which the CONTRACTOR and/or Owner may incur as a result of any such act or omission, including, but not limited to reasonable attorney's fees incurred arising therefrom, whether suit is filed or not.

Refer to Schedule F of this agreement for specific insurance requirements. Certificates certifying to the minimum insurance coverage shall be delivered to the CONTRACTOR before commencing work, and shall not be less than limits specified for this project, unless authorized in writing by the CONTRACTOR.

\*       \*       \*

## SCHEDULE "F"

## INSURANCE COVERAGES FOR SUBCONTRACTORS & SUB-SUBCONTRACTORS & MATERIAL SUPPLIERS – ARTICLE 6

The Subcontractor shall purchase and maintain at the Subcontractor's expense the following types and amounts [of] insurance coverage for the life of this Subcontract. . . .

The Limits of this Insurance shall not be less than the following Limits:

COMMERCIAL GENERAL LIABILITY INSURANCE:

| | |
|---|---|
| Each Occurrence Limits | $1,000,000 |
| Personal & Advertising Injury Limit | $1,000,000 |
| Fire Damage Limit (any one fire) | $     50,000 |
| Medical Expense Limit (anyone person) | $     10,000 |
| Products & Compl. Operations Aggregate Limit | $2,000,000 |
| General Aggregate Limit | $2,000,000 |

\*       \*       \*

## GENERAL INSURANCE INFORMATION AND REQUIREMENTS

Certificates of Insurance acceptable to the Owner and Contractor, for the

Subcontractor's insurance must be received within five (5) days of the Notification of Selection and at a time of signing Subcontract Agreement.

All Certificates of Insurance must contain the following provisions:

1.     Coverage afforded under the policies will not be cancelled or allowed to expire until at least thirty (30) days prior written notice has been given to the AUCHTER COMPANY . . . .

2.     All policies, except Workers' Compensation, are primary and non-contributory.

3.     General Liability, Auto Liability and Excess Liability shall name THE AUCHTER COMPANY as additional Insured "for all Auchter Projects" including Completed Operations (Form CG2010 1185 edition or equivalent).

  *     *     *

**Exhibit "B"**, pp. 1 & 2; Schedule "F".

23.     Upon information and belief, Auchter failed to achieve substantial completion of the Project by December 18, 2006.

24.     Auchter apparently experienced financial difficulties and was unable to complete the Project.

25.     Arch began to fund Auchter's obligations and assist Auchter with completion of the Project pursuant to the payment and performance bonds.

26.     In April 2007, Arch met with RAP and assured RAP that Arch intended to financially support Auchter in completing the Project.  Representatives of Arch told RAP that the subcontractors would be paid and that Arch would direct Auchter in the completion of the work.

11

27.     Arch also brought in its own construction consultant group, Forcon International, ("Forcon") that controlled the construction at the Project.

28.     Notwithstanding Arch's financial assistance to Auchter on the Project, Auchter never completed construction and eventually abandoned the Project.

29.     Arch ultimately assumed full control and management of the subcontractors and retained additional subcontractors in an effort to complete all construction and remedy the alleged defective work.

30.     Arch assumed full control of construction of the Project and agreed to complete construction, hired its own staff to work on the Project, and hired Forcon as construction manager.  Auchter or its personnel had no authority to direct the work or control expenses after Forcon was retained as the construction manager.

31.     Arch, through Forcon, controlled and managed the work on the Project.

32.     Forcon would review and grant authorizations for specific items to be funded and had control of payroll for the Project.  Eventually, Auchter's employees were no longer on site and only Forcon remained to finish the work; by September 2007, there were no Auchter personnel at the Project.

33.     Forcon also took charge of contacting the subcontractors who had performed work in order to request them to complete the remaining punch list items.

34.     During Arch's control of the Project, RAP made several requests that Arch honor its representations and complete the punch list items along with the repair of the building envelope problems at the Project.

35.     Arch disputed items on the punch list and took the position that several of those items were not within the scope of Auchter's work or had already been performed.

36.     After substantial additional delays in completing the work, Arch changed positions and asserted that it was not obligated to complete construction or remedy defects, but was only obligated to indemnify RAP for losses, if any, resulting from incomplete and defective construction.  Arch then changed positions again and agreed to remedy the defective construction and complete work.

37.     On April 12, 2010, Arch sent a letter to RAP and the Project's architect Rolland DelValle & Bradley ("RDB") demanding full payment of the Guaranteed Maximum Price balance.  Arch's letter did not address the outstanding punch list items or the ongoing issues RAP was experiencing with the building envelope deficiencies.

38.     Despite its assurances, Arch failed to complete all construction work at the Project, including completion of all punch list items, and the repair and replacement of the glass and the glazing systems of the building envelope.

39.     In reaching an impasse with Arch, RAP allegedly completed the

Project and corrected construction deficiencies at the Project, including completing the punch list items.

### B.    <u>The Underlying Action</u>

40.    In 2010, RAP filed the Underlying Action against Auchter and Arch. The Underlying Action sought amounts related to Auchter's and Arch's allegedly defective construction of the Project and Arch's breach of its performance bond. A copy of the Amended Complaint is attached as **Exhibit "C".**

41.    Amerisure provided Auchter a defense in the Underlying Action under a reservation of rights dated June 24, 2010, which was supplemented on March 30, 2012.  *See* the reservation of rights letters attached as **Group Exhibit "D".**

42.    In the Underlying Action, Auchter and Arch filed a third-party complaint against TSG, B & B and other subcontractors seeking to recover amounts attributable to, and resulting from, each of the subcontractor's defective work.  *See* the Amended Third Party Complaint attached as **Exhibit "E"**.

43.    The Underlying Action alleged that Auchter, among other things: (a) failed to supply enough properly skilled workers or proper materials to the Project; (b) failed to proceed with necessary work required under the terms of the contract with RAP; (c) failed to complete all work and to correct defective and deficient work; and, (d) failed to deliver a completed Project in accordance with the

requirements of the contract.  *See* **Exhibit "C"**, pp. 10 – 11.

44.    The Underlying Action alleged that Arch, among other things: breached the performance bond with resulting damages for delay, for necessary completion of work required under the contract, for correction of construction deficiencies including to the building envelope, for diminution in value of the Project, to have represented that it would complete construction of the Project under the contract and remedy the alleged defects, and then represent that it was not obligated to complete construction and remedy the alleged defects but would indemnify RAP for them, only to reverse and agree to complete construction and remedy defects.  *See* **Exhibit "C"**, p. 6.

45.    The Underlying Action was tried from March 24, 2014 through May 2, 2014.  The Final Judgment was entered on November 5, 2014.  *See* **Exhibit "A".**

46.    The Final Judgment stated that RAP is entitled to three categories of damages for: 1) deficiencies in the glass and glazing systems of the building envelope; 2) unfinished and deficient punch list items; and 3) delays related to the failure to complete the project in accordance with the contractual requirements. *See* **Exhibit "A"**.

47.    The Final Judgment held the following: (a)  Auchter is responsible to RAP for the sum of $11,267,515.75, plus post-judgment interest; (b)   Arch is

responsible to RAP for the sum of  $8,791,460.72, plus post-judgment interest; (c) TSG, a subcontractor of Auchter for the building envelope, including windows, is responsible to Arch and Auchter for the sum of $5,067,033.01, plus post-judgment interest; (d) B & B, a subcontractor of Auchter for various labor items such as installation of the following:   curbs, storm drainage system, and topsoil for landscaping, is responsible to Arch and Auchter for the sum of $263,487.54; and, (e) pre-judgment interest, reserved for determination.   *Id*.

48.    Arch has entered into a settlement agreement and assignment of claims with RAP in connection with the Final Judgment (herein referred as the "Arch Agreement").  A copy of the Arch Agreement is attached as **Exhibit "Q"**. The Arch Agreement preserves Arch's rights to pursue Auchter and Auchter's insurers in relation to the "delay issues, punch list issues, defects and/or deficiencies that were raised in the Litigation."

  **C.**  **Landmark's Primary Duty to Defend Auchter**

    **1.**  **Landmark's Primary Policies**

49.    Landmark issued two primary, Commercial General Liability policies to TSG, bearing policy number LHA103911, effective from January 22, 2006 to January 22, 2007, and policy number LHA104850, effective from January 22, 2007 to January 22, 2008 (herein referred as the "Landmark Primary Policies"). *See* **Exhibits "F" & "G"**.

50.     The Landmark Primary Policies state in relevant part:

**SECTION I - COVERAGES**

**COVERAGE   A.        BODILY   INJURY   AND PROPERTY DAMAGE LIABILITY**

**1.       Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured[3] against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.  But:

\*        \*        \*

**SECTION  IV – COMMERCIAL  GENERAL  LIABILITY CONDITIONS**

\*        \*        \*

**4.       Other Insurance**

\*        \*        \*

**a.       Primary Insurance**

This insurance is primary except when b. below applies.  If this

---

[3] The Landmark Primary Policies state that "[t]he word 'insured' means any person or organization qualifying as such under Section II – Who Is An Insured.  *See* **Exhibits "F" & "G"**.

insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in C. below.

**b.     Excess Insurance**

This insurance is excess over:

(1)     Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a)     That is Fire, extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(b)     That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c)     That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d)     If the loss arises out of the maintenance or use of aircraft. "autos" or watercraft to the extent not subject to exclusion g. of Section I – Coverage A – Bodily Injury And Property Damage Liability.

(2)     Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

*See* **Exhibits "F" & "G".**

18

51.    Landmark  Primary  Policy  number  LHA103911  also  contains  the following additional insured endorsement:

## ADITIONAL INSURED – BY WRITTEN CONRACT, WRITTEN AGREEMENT OR WRITTEN PERMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following is added to SECTION II – WHO IS AN INSURED

5.    a.    Any person or organization you are required by written contract, written agreement or written permit to name as an insured is an insured but only with respect to liability arising out of:

1.    "Your work" performed for that insured at the location designated in the written contract, written agreement or written permit; or

2.    Premises owned or used by you.

\*        \*        \*

d.    This insurance is primary if that is required by written contract, written agreement or written permit.

*See* **Exhibit "F".**

52.    Landmark  Primary  Policy  number  LHA104850,  contains  the  same Coverage A insuring agreement, but also includes the following additional insured endorsement:

## ADDITIONAL INSURED

## BLANKET – PRIMARY AND YOUR WORK

This endorsement modifies insurance provided under the following

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

SCHEDULE

Name of Person or Organization:

Any person or organization to whom or to which you are obligated by virtue of a written contract or by the issuance or existence of a written contract, to provide insurance such as is afforded by this policy.

A.    SECTION --  WHO IS AN INSURED  is amended to include as an additional insured the person(s) or organization(s) shown in the SCEHDULE, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1.    Your acts or omissions; or

2.    The acts or omissions of those acting on your behalf;

In performance of your ongoing operations or "your work" for the additional insured(s) designated above.

B.    If you are required by a written contract to provide primary insurance, this policy shall be primary and SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS, 4. Other Insurance does not apply, but only with respect to coverage provided by this policy.

*See* **Exhibit "G".**

## 2.    Landmark Breaches its Duty to Defend Auchter

53.    On  May  11,  2011,  Landmark,  through  its  authorized  claims administrator RSUI Group, Inc., issued a reservation of rights letter to Auchter

20

wherein it acknowledged its duty to defend Auchter in the Underlying Action.  *See* **Exhibit "H"**.  Herein, references to "Landmark" include RSUI Group, Inc.

54.    On May 12, 2011, Landmark informed Auchter that it "had agreed to retain your firm [Taylor, Day, Currie, Boyd & Jonson] to defend its additional insured The Auchter Company in the [Underlying Action]."  *See* **Exhibit "I"**.

55.    In its May 12th letter, Landmark informed Auchter's counsel (*i.e.,* Taylor, Day, Currie, Boyd & Jonson) that "[t]he agreed upon rates for your representation in this matter are as follows: $200.00/hr for partners; $175.00/hr for associates; and $90.00 for paralegals."  *See* **Exhibit "I"**.  Landmark also informed Auchter's counsel that "[w]ith respect to invoices for your services, please send written invoices in accordance with the Guidelines to the following:  William G. Dupre, RSUI Group, Inc., 945 East Paces Ferry Rd., Suite 1800, Atlanta, GA 303026."  *Id.*

56.    On July 6, 2011, Landmark informed Auchter that "the effective date of  [Landmark's] acceptance of defense on behalf of [Auchter] is August 11, 2010, which was the date of the original tender."  *See* **Exhibit "J"**.

57.    On July 11, 2011, Amerisure, seeking reimbursement of defense costs from Landmark, sent Landmark expense payment records commencing from the time Landmark accepted Auchter's defense on August 11, 2010.  *See* **Exhibit "K"**. Landmark refused to reimburse Amerisure for such defense costs.  Since that time,

21

Amerisure has paid additional defense costs, and has made continued requests that Landmark reimburse Amerisure for same. Landmark has refused to reimburse Amerisure for any defense costs.

58. Rather than honor its contractual obligation to Auchter, Landmark, on September 9, 2011, attempted to *ex post-facto* condition its defense obligation to Auchter by informing Amerisure that "[Landmark's] acceptance of [Auchter's] tender was and is conditioned upon an agreement with Amerisure that RSUI would only be responsible for payment of fifty-percent of [Auchter's] defense costs." *See* **Exhibit "L".** No such "conditional" acceptance of Auchter's defense was ever conveyed to, or accepted by, Auchter or Amerisure.

59. To date, Landmark has failed to participate in Auchter's defense, or pay any portion of its defense costs in the Underlying Action.

60. Landmark has breached its duty to defend Auchter and is liable for all defense costs attributable to the defense of Auchter in the Underlying Action and all damages that naturally and probably flow from its breach.

**D.     The Amerisure Policies**

**1.     Amerisure's CGL Policies**

61. Amerisure issued two CGL policies to Auchter, bearing policy number GL 2009278 and which were effective from January 1, 2006 to January 1, 2007, and January 1, 2007 to January 1, 2008 ("CGL Policies"). *See* **Exhibits**

22

**"M" & "N".**

62.    The CGL Coverage Part of the CGL Policies states in relevant part:

**SECTION I - COVERAGES**

**COVERAGE   A.        BODILY   INJURY   AND PROPERTY DAMAGE LIABILITY**

**2.        Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.  But:

*        *        *

b.        This insurance applies to "bodily injury" and "property damage" only if:

*        *        *

(2)     The "bodily injury" or "property damage" occurs during the policy period; . . .

*        *        *

**2.     Exclusions**
This insurance does not apply to:

**a.        Expected Or Intended Injury**

23

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b.** **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. ..

   \*    \*    \*

**j.** **Damage To Property**

"Property damage" to:

    \*     \*    \*

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

**k.** **Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.** **Damage To Your Work**

24

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.    Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

63.    The CGL Policies also contain the following Excess Insurance Condition:

**EXCESS INSURANCE CONDITION - WHEN YOU ARE AN INSURED ON OTHER INSURANCE**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

All of the terms, provisions, exclusions, and limitations of the coverage form apply except as specifically stated below.

Paragraph **4.b.** of the Other Insurance Condition - (Section IV - Commercial General Liability Conditions) is deleted and replaced by the following:

**4.       Other Insurance**

**b.       Excess Insurance**

This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis:

**(1)**     That is Fire, Extended Coverage, Builder's Risk, Installation Risk, or similar coverage for "your work;"

**(2)**     That is Fire Insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(3)**     That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner;

**(4)**     If the loss arises out of the maintenance or use of aircraft, "autos", or watercraft to the extent not subject to Exclusion **g.** of Section I - Coverage **A** - Bodily Injury And Property Damage Liability; or

**(5)**     That is valid and collectible insurance available to you as an insured under any other policy.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend any claim or "suit" that any other insurer has a duty to defend.  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

*See* **Exhibits "M" and "N".**

26

64.     The CGL Policies contain an Exterior Insulation and Finish Systems Exclusion, which states:

    **A.**    This insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

        **1.**    The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

        **2.**    "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

    **B.**    The following definition is added to the Definitions Section:

    "Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:[4]

---

[4] 1. A rigid or semi-rigid insulation board made of expanded polystyrene and other materials; 2. A reinforced or unreinforced base coat; 3.The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate; 4. A finish coat providing surface texture to which color may be added; and 5. Any flashing, caulking or sealant used with the system for any purpose. *See* **Ex. "M"** & **"N"**.

65.    The CGL Policies contain a Contractors Professional Services Liability Coverage Endorsement which states the following in pertinent part:

**SECTION I – COVERAGES** is amended as follows:

1.    The following exclusion is added to **SECTION I – COVERAGES A AND B:**

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the rendering or failure to render any professional services by or for you, including:

**(1)**    The preparing, approving, or failing to prepare or approve maps, drawings, opinions, plans, reports, analyses, surveys, change orders, designs or specifications; and

**(2)**    Inspection or engineering services.

2.    The following is added to **SECTION I – COVERAGES:**

**COVERAGE E. – CONTRACTORS PROFESSIONAL SERVICES LIABILITY COVERAGE**

**1.    Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages arising out of any "negligent act" committed by the insured, or on behalf of the insured to which this insurance applies.  We will have the right and duty to defend any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for any "negligent act" to which this

28

insurance does not apply.  We may at our discretion investigate any "negligent act" and settle any claim or "suit" that may result.  But:

\*        \*        \*

**2.**  **Exclusions**

The insurance provided by this endorsement does not apply to:

\*        \*        \*

**b.**  Damages expected, or intended by or at the direction of the insured, or that should have been reasonably foreseen by the insured.

**c.**  Damages which the insured is obligated to pay be reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

\*        \*        \*

**g.**  "Property Damage" to: (2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises.

**h.**  Damages resulting from the insolvency or bankruptcy of the insured.

\*        \*        \*

**p.**  Damages arising out of the failure to render any "design services" on time, complete any project on time, or any other delay.

\*        \*        \*

**t.**  Faulty workmanship, construction or work not in accordance with the design of the

29

project or the construction documents, on projects for which the "design services" are performed by the insured and any construction, erection, fabrication, installation, assembly, manufacture, or supplying of equipment or materials incorporated therein, is wholly or partly performed by:

**(1)**    The insured;

**(2)**    Any subsidiary of the insured; or

**(3)**    Any individual, partnership, joint venture or corporation:

       **(a)**    Under common ownership, management or control with the insured;

       **(b)**    Acting as the insured's subcontractor; or

       **(c)**    That owns the insured.

\*         \*         \*

E.    The following definitions are added to **SECTION V – DEFINITIONS:**

"Construction Management Services" means the providing of construction expertise in the form of recommendations to the owner and design professionals during the planning and design phases, the scheduling of construction and the overall coordination of the separate prime contractors during the construction phase.

"Contractors Professional Services" means the professional services that are necessary and incidental to the conduct of your contractor business described.

"Design Services" means preparing or approving maps, drawings, opinions, plans, reports, analyses, surveys, change orders, designs or specifications, inspection and engineering services performed by or on behalf of the insured or others in the capacity as described in the above Schedule.

"Negligent Act" means an error or omission by the insured arising out of the performance of or failure to perform "Contractors Professional Services", including "Design Services" and "Construction Management Services".

*See* **Exhibits "M" and "N".**

### 2.     Amerisure's Umbrella Policies

66.     Amerisure also issued two umbrella liability policies to Auchter bearing policy number CU 2009380, and which were effective from January 1, 2006 to January 1, 2007, and January 1, 2007 to January 1, 2008 ("Umbrella Policies").  *See* **Exhibits "O"** & **"P"**.   Herein, the "CGL Policies" and the "Umbrella Policies" will be collectively referred to as the "Amerisure Policies".

67.     The Umbrella Policies contain a number of policy terms and exclusions similar to those in the CGL Policies, and thus such similar terms and exclusions are not reproduced herein.  Other terms and exclusions included in the Umbrella Policies are set forth below:

### SECTION I - COVERAGES

### COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

#### 1.     Insuring Agreement

31

**a.** We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply….

\*       \*       \*

**b.** This insurance applies only to "bodily injury" and "property damage" only if:

\*       \*       \*

**(2)** The "bodily injury" or "property damage" occurs during the policy period…

\*       \*       \*

**2.   Exclusions**

\*       \*       \*

**s.   Professional Services**
"Bodily injury" or "property damage" due to rendering or failure to render any professional service. ….

68.   The Umbrella Policies neither contain nor follow form to the

Contractors Professional Services Liability Coverage Endorsement.

### 3.     Amerisure Defends Auchter in the Underlying Action

69.     Despite not owing a primary obligation to defend, in order to protect Auchter's interests, Amerisure agreed to defend Auchter in the Underlying Action subject to a reservation of rights while continuing to request that Landmark honor its contractual obligations to Auchter as an additional insured.  *See* **Exhibit "D".**

70.     Amerisure made several attempts to encourage Landmark to honor its primary duty to defend.  To no avail.

71.     Amerisure's defense of Auchter was undertaken, despite not being primarily obligated to do so, without waiving its rights to seek reimbursement from Landmark, and in an effort to prevent any injustice or prejudice to Auchter.

72.     From August 11, 2010, Amerisure paid the sum of $1,196,263.90 in defense costs on behalf of Auchter. The amounts paid by Amerisure to defend Auchter in the Underlying Action were reasonable and necessary.

<u>**COUNT I**</u>
<u>**NO DUTY TO INDEMNIFY UNDER COVERAGE**</u>
<u>**"A" OF THE AMERISURE POLICIES[5] – FINAL**</u>
<u>**JUDGMENT AMOUNTS AWARDED FOR**</u>
<u>**UNFINISHED OR DEFICIENT PUNCH LIST**</u>
<u>**ITEMS**</u>

73.     Amerisure incorporates the allegations set forth within Paragraphs 1

---

[5] As the positions in Counts I, III and V also apply to the Umbrella Policies, a finding that Amerisure owes no duty to indemnify in connection with the Final Judgment equally applies to the Umbrella Policies.

through 72 as if fully set forth herein.

74.     The Amerisure Policies provide that "we will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies."   The "property damage" must be "caused by an 'occurrence' . . . [and] occur during the policy period."   **Exhibits "M", "N", "O" & "P"**.

75.     Insureds and their assignees and subrogees carry the burden of bringing a claim within the ambit of insurance coverage.

76.     The Final Judgment awards amounts for unfinished or deficient punch list items (*e.g.,* handrail painting, restrooms tile cleaning, painting of CMU block in parking garage, light fixture replacement, ductwork insulation, and additional costs of completion), which do not fall within Coverage "A" of the Insuring Agreement, or are otherwise excluded from coverage under the Amerisure Policies.  *See* **Exhibit "A**", pp. 26-31.

77.     The Final Judgment also awards amounts for future work estimates (*e.g.,* installation of lower eyebrow canopies, installation of crowns, medallions and spines, replacement of EIFS[6] panels, non-conforming expansion joints, failure to construct storm vaults in conformity with the permits, and failure to provide

---

[6] Exterior insulation finish system that consists of a synthetic stucco over a substrate.

close out documents), which do not fall within Coverage "A" of the Insuring Agreement, or are also otherwise excluded from coverage under the Amerisure Policies. *See* **Exhibit "A"**, pp. 22-24.

78.   All amounts awarded in the Final Judgment for the unfinished or deficient punch list items and future work estimates do not qualify as "property damage" caused by an "occurrence", as is required under the Amerisure Policies.

79.   The mere repair and replacement of the work itself does not constitute "property damage" caused by an "occurrence", as those terms are defined under a CGL policy.

80.   Additionally, mere breach of contract claims (*e.g.,* failure to perform, failure to complete) do not qualify as an "occurrence" under a CGL policy.

81.   Separate and apart from the requirements of the Coverage "A" Insuring Agreement, the Amerisure Policies also contain several applicable exclusions barring coverage for the amounts awarded for the unfinished or deficient punch list items and future work estimates, namely:  the "Damage to Your Work" exclusion; "Damage to Your Product" exclusion; "Impaired Property Or Property Not Physically Injured" exclusion; "Expected or Intended" exclusion; "professional services" exclusion; "Contractual Liability" exclusion; and the "Exterior Insulation and Finish System" exclusion. *See* **Exhibits "M"**, **"N"**, **"O"** & **"P"**.

82.    As all elements and amounts awarded in connection with the unfinished or deficient punch list items and future work estimates are beyond the coverage of the Amerisure Policies, Amerisure possesses no duty to indemnify Auchter, its alleged or actual assignees and/or subrogees for any such amounts awarded in the Final Judgment.

83.    Alternatively, even if certain amounts awarded for the unfinished or deficient punch list items and the future work estimates in the Final Judgment arguably could fall within the ambit of coverage under the Amerisure Policies, and are not otherwise excluded, the Final Judgment does not apportion or allocate what portion of the Final Judgment is attributable to covered amounts (*i.e.,* "property damage"), and what portion is attributable to amounts that do not fall within the scope of coverage or are otherwise excluded under the policies of insurance.

84.    After entry of the Final Judgment, Arch entered into the Arch Agreement with RAP.  *See* **Exhibit "Q"**.  In the Arch Agreement, Arch paid $16.8 Million to RAP in exchange for a release of certain claims included within the Final Judgment.  In so doing, however, the Arch Agreement seeks to preserve Arch's ability to pursue Auchter and Auchter's insurers in relation to the "delay issues, punch list issues, defects and/or deficiencies that were raised in the Litigation", the settlement funds paid to RAP and certain attorneys' fees, costs and expert expenses.  *See* **Exhibit "Q"** at p. 2, Para. 3.

85.     The burden of apportioning or allocating covered damages is on the party seeking to recover from the insurer.

86.     Auchter, its alleged or actual assignees and/or subrogees were, or should have been, aware of the need to allocate and/or apportion the amounts awarded in the Final Judgment as a requirement to seeking recovery under the Amerisure Policies.  No allocation or apportionment of the Final Judgment was requested or performed.

87.     Arch, likewise, was aware of the need to allocate and/or apportion the amounts awarded in the Final Judgment and/or the Arch Agreement, as a requirement to seeking any recovery under the Amerisure Policies.  No allocation or apportionment of the Final Judgment or the Arch Agreement was requested or performed.

88.     Thus, to the extent that Auchter, its alleged or actual assignees and/or subrogees fail or are unable to allocate what specific portion of the amount awarded for the unfinished or deficient punch list items and future work estimates in the Final Judgment and/or the Arch Agreement qualifies as covered "property damage", they are also barred from any recovery under the Amerisure Policies.

**WHEREFORE**, Amerisure Insurance Company and Amerisure Mutual Insurance Company respectfully request entry of a declaratory judgment finding and declaring that Amerisure has no indemnity obligation in connection with the

award in the Final Judgment and/or the Arch Agreement for the unfinished or deficient punch list items and future work estimates, together with costs and any other further relief this Court deems just and proper.

**COUNT II**
**NO DUTY TO INDEMNIFY UNDER**
**ENDORSEMENT "C" OF THE CGL POLICIES–**
**FINAL JUDGMENT AMOUNTS AWARDED FOR**
**UNFINISHED OR DEFICIENT PUNCH LIST**
**ITEMS**

89.     Amerisure incorporates the allegations set forth within Paragraphs 1 through 72 as if fully set forth herein.

90.     The CGL Policies also include Endorsement "C" – Contractors Professional Services Liability Coverage. Any coverage afforded under Endorsement "C" is separate from, and not in addition to, that provided under Coverage "A". *See* **Exhibits "M"** & **"N"**.

91.     The Insuring Agreement for Endorsement "C" states:  "[w]e will pay those sums that the insured becomes legally obligated to pay as damages arising out of any 'negligent act' committed by the insured . . . to which the insurance applies."  "'Negligent act' means an error or omission by the insured arising out of the performance of or failure to perform 'Contractors Professional Services', including 'Design Services' and 'Construction Management Services'", and must "occur during the policy period".  **Exhibits "M"** & **"N"**.

92.     Insureds and their assignees and subrogees carry the burden of bringing a claim within the ambit of coverage.

93.     The Final Judgment awards amounts for unfinished or deficient punch list items (*e.g.,* handrail painting, restrooms tile cleaning, painting of CMU block in parking garage, light fixture replacement, ductwork insulation, and additional costs of completion), which do not fall within Endorsement "C" – Insuring Agreement, or are otherwise excluded.  *See* **Exhibit "A"**, pp. 26-31.

94.     The Final Judgment also awards amounts for future work estimates (*e.g.,* installation of lower eyebrow canopies, installation of crowns, medallions and spines, replacement of EIFS panels, non-conforming expansion joints, failure to construct storm vaults in conformity with the permits, and failure to provide close out documents), which do not fall within Endorsement "C" – Insuring Agreement, or are otherwise excluded.  *See* **Exhibit "A"**, pp. 22-24.

95.     All of the amounts awarded for the unfinished or deficient punch list items and future work estimates do not qualify as "damage" caused by a "negligent act" under the Contractors Professional Services Liability Coverage Endorsement.

96.     The mere repair, replacement or future completion of the work itself does not constitute "damage" arising out of a "negligent act" under the Contractors Professional Services Liability Coverage Endorsement.

97.     Additionally, mere breach of contract claims (*e.g.,* failure to perform,

failure to complete) do not qualify as "damage" arising out of a "negligent act" under the Contractors Professional Services Liability Coverage Endorsement.

98.     Separate and apart from the requirements of Endorsement "C" – Insuring Agreement, the Contractors Professional Services Liability Coverage Endorsement also contains several applicable exclusions barring coverage for the amounts awarded for the unfinished or deficient punch list items and future work estimates, including, but not limited to: the "insolvency or bankruptcy" exclusion; "damages due to delay" exclusion; "Design Services" exclusion; and the "Expected or Intended" exclusion.  *See* **Exhibits "M"** & **"N"**.

99.     All elements awarded for the unfinished or deficient punch list items and the future work estimates are beyond the coverage of the Contractors Professional Services Liability Coverage Endorsement.

100.    Amerisure, therefore, possesses no duty to indemnify Auchter, its alleged or actual assignees and/or subrogees for all amounts awarded in connection with the unfinished or deficient punch list items and future work estimates in the Final Judgment.

101.    Alternatively, even if the Final Judgment arguably awards damages that may fall  within the ambit of coverage of the Contractors Professional Services Liability Coverage Endorsement of the Amerisure Policies, and are not otherwise excluded, the Final Judgment does not apportion or allocate what portion of the

Final Judgment is attributable to covered amounts (*i.e.,* "damages arising out of a 'negligent act' committed by the insured"), and what amounts fall outside the scope of coverage or are otherwise excluded under the policies.

102.   After entry of the Final Judgment, Arch entered into the Arch Agreement with RAP.  *See* **Exhibit "Q"**.  In the Arch Agreement, Arch paid $16.8 Million to RAP in exchange for a release of certain claims included within the Final Judgment.   In so doing, however, the Arch Agreement seeks to preserve Arch's ability to pursue Auchter and Auchter's insurers in relation to the "delay issues, punch list issues, defects and/or deficiencies that were raised in the Litigation", the settlement funds paid to RAP and certain attorneys' fees, costs and expert expenses.  *See* **Exhibit "Q"** at p. 2, Para. 3.

103.   The burden of apportioning or allocating these damages is on the party seeking to recover from the insurer.

104.   Auchter, its alleged or actual assignees and/or subrogees were, or should have been, aware of the need to allocate and/or apportion the amounts awarded in the Final Judgment as a condition to seeking any recovery under the Contractors Professional Services Liability Coverage Endorsement of the Amerisure Policies, but failed to do so.

105.   Arch, likewise, was aware of the need to allocate and/or apportion the amounts awarded in the Final Judgment and/or the Arch Agreement, as a

requirement to seeking any recovery under the Amerisure Policies.  No allocation or apportionment of the Final Judgment or the Arch Agreement was requested or performed.

106.   Thus, to the extent that Auchter, its alleged or actual assignees, subrogees, or any party seeking to recover amounts awarded for the unfinished or deficient punch list items and future work estimates in the Final Judgment and/or the Arch Agreement fails to allocate that specific portion of covered "damage" arising out of Auchter's "negligent act", they are barred from any recovery under the Contractors Professional Services Liability Coverage Endorsement.

**WHEREFORE**, Amerisure Insurance Company and Amerisure Mutual Insurance Company respectfully request entry of a declaratory judgment finding and declaring that Amerisure has no indemnity obligation in connection with the award in the Final Judgment and or the Arch Agreement for the unfinished or deficient punch list items and future work estimates, together with costs and any other further relief this Court deems just and proper.

**COUNT III**
**NO DUTY TO INDEMNIFY UNDER COVERAGE**
**"A" OF THE AMERISURE POLICIES – FINAL**
**JUDGMENT AMOUNTS AWARDED FOR**
**DEFICIENCIES IN THE GLASS AND GLAZING**
**SYSTEMS OF THE BUILDING ENVELOPE**

107.   Amerisure incorporates the allegations set forth within Paragraphs 1

through 72 as if fully set forth herein.

108.   The CGL Policies provide that:  "[w]e will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies."   The "property damage" must be "caused by an 'occurrence' . . . [and] occur during the policy period."   *See* **Exhibits "M", "N", "O"** & **"P"**.

109.   Insureds and their assignees and subrogees carry the burden of bringing a claim within the ambit of coverage.

110.   The Final Judgment awards amounts for unfinished or deficient building envelope work related to the glass and the glazing systems (*e.g.,* failure to consistently use the specified factory gaskets around the windows; installation of perimeter sealants at the wrong locations; the as-built condition of the windows deviated from both the shop drawings and the state product approvals for the window system – the intermediate horizontal sections of the windows were intended to have diverters to divert much of the water that worked past the external gaskets down the side of the frame and into the deeper bottom sill/gutter of the window where it would "weep out" although TSG plugged the ends of the diverters effectively converting them to end dams), which do not fall within the Coverage "A" Insuring Agreement, or are otherwise excluded from coverage under the Amerisure Policies.  *See* **Exhibit "A",** p. 15.

111.   The Final Judgment also awards amounts for future work estimates (*e.g.,* replacement of windows, which will require removal and replacement of the glass from inside the building, which requires removal of drywall and ceiling panels, repair and replacement of factory gaskets around the windows, perimeter sealants installed in wrong location must be relocated), which also do not fall within the Coverage "A" Insuring Agreement, or are also excluded from coverage under the Amerisure Policies.  *See* **Exhibit "A**", pp. 16-17.

112.   All of the amounts awarded for the unfinished or deficient glass and glazing issues as respects to the building envelope and future work estimates do not qualify as "property damage" caused by an "occurrence" as those terms are defined under the Amerisure Policies.

113.   The mere repair and replacement of the work itself does not constitute "property damage" caused by an "occurrence" under a CGL policy.

114.   Additionally, mere breach of contract claims (*e.g.,* failure to perform, failure to complete) do not qualify as an "occurrence" under a CGL policy.

115.   Separate and apart from the requirements of the Insuring Agreement, the Amerisure Policies also contain several applicable exclusions barring coverage for all of the amounts awarded for the unfinished or deficient glass and glazing issues as respects to the building envelope and future work estimates, including, but not limited to:  the "Damage to Your Work" exclusion; "Damage to Your

Product" exclusion; "Impaired Property Or Property Not Physically Injured" exclusion; "Expected or Intended" exclusion; "professional services" exclusion; "Contractual Liability" exclusion; and the "Exterior Insulation and Finish System" exclusion. *See* **Exhibits "M", "N", "O"** & **"P"**.

116.   Thus, as all elements awarded for the unfinished or deficient glass and glazing issues of the building envelope and future work estimates are beyond the coverage of the Amerisure Policies, Amerisure possesses no duty to indemnify Auchter, its alleged or actual assignees and/or subrogees for all such amounts awarded in the Final Judgment.

117.   Alternatively, even if certain amounts awarded for the unfinished or deficient glass and glazing systems in the building envelope and future work estimates in the Final Judgment arguably could fall within the ambit of coverage under the Amerisure Policies, and are not otherwise excluded, the Final Judgment does not apportion or allocate what portion of the Final Judgment is attributable to coverage amounts (*i.e.,* "property damage"), and what portion is attributable to repair and replacement of the insured's, or any subcontractors working on its behalf, work and/or their breach of contract.

118.   After entry of the Final Judgment, Arch entered into the Arch Agreement with RAP. *See* **Exhibit "Q"**.   In the Arch agreement, Arch paid $16.8 Million to RAP in exchange for a release of certain claims included within the

Final Judgment.  In so doing, however, the Arch Agreement seeks to preserve Arch's ability to pursue Auchter and Auchter's insurers in relation to the "delay issues, punch list issues, defects and/or deficiencies that were raised in the Litigation", the settlement funds paid to RAP and certain attorneys' fees, costs and expert expenses. *See* **Exhibit "Q"**.

119.   The burden of apportioning or allocating these damages is on the party seeking to recover from the insurer.

120.   Auchter, its alleged or actual assignees and/or subrogees  were, or should have been, aware of the need to allocate and/or apportion the amounts awarded in the Final Judgment prior to seeking any recovery under the Amerisure Policies, but failed to do so.

121.   Arch, likewise, was aware of the need to allocate and/or apportion the amounts awarded in the Final Judgment and/or the Arch Agreement, as a requirement to seeking any recovery under the Amerisure Policies.  No allocation or apportionment of the Final Judgment or the Arch Agreement was requested or performed.

122.   Thus, to the extent that Auchter, its alleged or actual assignees, subrogees or any party seeking to recover amounts awarded in the Final Judgment and/or the Arch Agreement for the unfinished or deficient building envelope work and future work estimates fails to allocate that portion of covered "property

damage", they are barred from any recovery under the Amerisure Policies.

**WHEREFORE**, Amerisure Insurance Company and Amerisure Mutual Insurance Company respectfully request entry of a declaratory judgment finding and declaring that Amerisure has no indemnity obligation in connection with the award in the Final Judgment and/or the Arch Agreement for the unfinished or deficient glass or glazing work on the building envelope and future work estimates, together with costs and any other further relief this Court deems just and proper.

**COUNT IV**
**NO DUTY TO INDEMNIFY UNDER**
**ENDORSEMENT "C" OF THE CGL POLICIES –**
**FINAL JUDGMENT AMOUNTS AWARDED FOR**
**DEFICIENCIES IN THE GLASS AND GLAZING**
**SYSTEMS OF THE BUILDING ENVELOPE**

123.   Amerisure incorporates the allegations set forth within Paragraphs 1 through 72 as if fully set forth herein.

124.   The CGL Policies also include Endorsement "C" – Contractors Professional Services Liability Coverage.   Any coverage afforded under Endorsement "C" is separate from, and not in addition to, that provided under Coverage "A".  *See* **Exhibits "M"** & **"N"**.

125.   The Endorsement "C" Insuring Agreement states:   "[w]e will pay those sums that the insured becomes legally obligated to pay as damages arising out of any 'negligent act' committed by the insured . . . to which the insurance

applies." "'Negligent act' means an error or omission by the insured arising out of the performance of or failure to perform 'Contractors Professional Services', including 'Design Services' and 'Construction Management Services'", and must "occur during the policy period". **Exhibits "M" & "N".**

126.   Insureds and their assignees and subrogees carry the burden of bringing a claim within the ambit of coverage.

127.   The Final Judgment awards amounts for unfinished or deficient work relating to the glass and glazing systems of the building envelope work (*e.g.,* failure to consistently use the specified factory gaskets around the windows; installation of perimeter sealants at the wrong locations; the as-built condition of the windows deviated from both the shop drawings and the state product approvals for the window system – the intermediate horizontal sections of the windows were intended to have diverters to divert much of the water that worked past the external gaskets down the side of the frame and into the deeper bottom sill/gutter of the window where it would "weep out" although TSG plugged the ends of the diverters effectively converting them to end dams), which do not fall within the Endorsement "C" Insuring Agreement, or are otherwise excluded under Amerisure CGL Policies. *See* **Exhibit "A",** p. 15.

128.   The Final Judgment also awards amounts for future work estimates (*e.g.,* replacement of windows, which will require removal of the glass from inside

the building, which requires removal of drywall and ceiling panels), which do not fall within the Endorsement "C" Insuring Agreement, or are otherwise excluded under the Amerisure CGL Policies.  *See* **Exhibit "A",** pp. 16-17.

129.   All of the amounts awarded for the unfinished or deficient work relating to the glass or the glazing systems in the building envelope and future work estimates do not qualify as "damage" caused by a "negligent act" under the Contractors Professional Services Liability Coverage Endorsement of the Amerisure CGL Policies.

130.   The mere repair and replacement of the work itself does not constitute "damage" arising out of a "negligent act" under the Contractors Professional Services Liability Coverage Endorsement.

131.   Additionally, mere breach of contract claims (*e.g.,* failure to perform, failure to complete) do not qualify as "damage" arising out of a "negligent act" under a Contractors Professional Services Liability Coverage Endorsement.

132.   Separate and apart from the requirements of the Endorsement "C" Insuring Agreement, the Contractors Professional Services Liability Coverage Endorsement also contains several applicable exclusions barring coverage for the amounts awarded for the unfinished or deficient glass and glazing work on the building envelope and future work estimates, including, but not limited to:  the "insolvency or bankruptcy" exclusion; "damages due to delay" exclusion; "Design

Services" exclusion; and the "Expected or Intended" exclusion.

133.   As all elements awarded for the unfinished or deficient building envelope work are beyond the coverage of the Contractors Professional Services Liability Coverage Endorsement, Amerisure possesses no duty to indemnify Auchter, its alleged or actual assignees and/or subrogees for any and all such amounts awarded in the Final Judgment.

134.   Alternatively, even if certain amounts awarded for the unfinished or deficient building envelope work and future work estimates in the Final Judgment arguably fell within the ambit of coverage under the Contractors Professional Services Liability Coverage Endorsement of the Amerisure CGL Policies, and were not otherwise excluded, the Final Judgment does not apportion or allocate what portion of the Final Judgment is attributable to coverage amounts (*i.e.,* "damage" arising from a "negligent act"), and what portion is attributable to repair and replacement of the insured's, or any subcontractors working on its behalf, work and/or their breach of contract.

135.   After entry of the Final Judgment, Arch entered into the Arch Agreement with RAP.  *See* **Exhibit "Q"**.  In the Arch Agreement, Arch paid $16.8 Million to RAP in exchange for a release of certain claims included within the Final Judgment.  In so doing, however, the Arch agreement seeks to preserve Arch's ability to pursue Auchter and Auchter's insurers in relation to the "delay

issues, punch list issues, defects and/or deficiencies that were raised in the Litigation", the settlement funds paid to RAP and certain attorneys' fees, costs and expert expenses. *See* **Exhibit "Q"** at p. 2, Para. 3.

136.   The burden of apportioning or allocating these damages is on the party seeking to recover from the insurer.

137.   Auchter, its alleged or actual assignees and/or subrogees were, or should have been, aware of the need to allocate and/or apportion the amounts awarded in the Final Judgment prior to seeking any recovery under the Contractors Professional Services Liability Coverage Endorsement, but failed to do so.

138.   Arch, likewise, was aware of the need to allocate and/or apportion the amounts awarded in the Final Judgment and/or the Arch Agreement, as a requirement to seeking any recovery under the Amerisure Policies.  No allocation or apportionment of the Final Judgment or the Arch Agreement was requested or performed.

139.   Thus, to the extent that Auchter, its alleged or actual assignees, subrogees, or any party seeking to recover amounts awarded for the unfinished or deficient glass and glazing work on the building envelope and future cost estimates in the Final Judgment and/or the Arch Agreement fails to allocate covered "damage" arising out of a "negligent act", they are barred from any recovery under the Contractors Professional Services Liability Coverage Endorsement.

WHEREFORE, Amerisure Insurance Company and Amerisure Mutual Insurance Company respectfully request entry of a declaratory judgment finding and declaring that Amerisure has no indemnity obligation in connection with all amounts awarded in the Final Judgment and/or the Arch Agreement for the unfinished or deficient work to the glass and glazing systems on building envelope and the future costs estimates, together with costs and any other further relief this Court deems just and proper.

**COUNT V**
**NO DUTY TO INDEMNIFY UNDER COVERAGE**
**"A" OF THE AMERISURE POLICIES – FINAL**
**JUDGMENT AMOUNTS AWARDED FOR DELAY**
**DAMAGES FOR THE FAILURE TO COMPLETE**
**CONSTRUCTION BY THE REQUIRED**
**COMPLETION DATE**

140.   Amerisure incorporates the allegations set forth within Paragraphs 1 through 72 as if fully set forth herein.

141.   The Amerisure Policies provide that "[w]e will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." The "property damage" must be "caused by an 'occurrence' . . . [and] occur during the policy period." **Exhibits "M", "N", "O"** & **"P"**.

142.   Insureds and their assignees and subrogees carry the burden of bringing a claim within the ambit of coverage.

143.   The Final Judgment awards amounts for damages for failing to complete the Project by the contractually-mandated date (*e.g.,* Auchter's failure to depict or otherwise describe in its schedule updates how actual events affected the critical path of the Project completion contributed to lost rents in the tower, lost parking revenues, extended contract administration charges from RDB [architect], extended construction management services for the owner's representative, additional construction loan interest from January 2007 through July 2007, and loss of use of monies resulting from mortgage requirements for maintaining an interest loan reserve), which do not fall within the Coverage "A" Insuring Agreement, or are otherwise excluded under Coverage "A" of the Amerisure Policies.  *See* **Exhibit "A",** pp. 35-39, 55.

144.   The mere repair and replacement of the work itself does not constitute "property damage" caused by an "occurrence" under a CGL policy.

145.   Additionally, mere breach of contract claims (*e.g.,* failure to perform, failure to complete) do not qualify as an "occurrence" under a CGL policy.

146.   Separate and apart from the requirements of the Insuring Agreement, the Amerisure Policies also contain several applicable exclusions barring coverage for all of the amounts awarded for the delay damages, namely:  the "Damage to Your Work" exclusion; "Damage to Your Product" exclusion; "Impaired Property Or Property Not Physically Injured" exclusion; "Expected or Intended" exclusion;

"professional services" exclusion; "Contractual Liability" exclusion; and the "Exterior Insulation and Finish System" exclusion.

147.   Thus, as all elements awarded for the delay for failing to complete the project by the contractually-mandated date are beyond the coverage of the Amerisure Policies, Amerisure possesses no duty to indemnify Auchter, its alleged or actual assignees and/or subrogees for all amounts awarded in the Final Judgment.

148.   Alternatively, even if certain amounts awarded for the delay damages in the Final Judgment arguably fell within the ambit of coverage under the Amerisure Policies, and are not otherwise excluded, the Final Judgment does not apportion or allocate what portion of the Final Judgment is attributable to coverage amounts (*i.e.,* "property damage"), and what portion is attributable to repair and replacement of the insured's, or any subcontractors working on its behalf, work and/or their breach of contract.

149.   After entry of the Final Judgment, Arch entered into the Arch Agreement with RAP.  *See* **Exhibit "Q"**.  In the Arch Agreement, Arch paid $16.8 Million to RAP in exchange for a release of certain claims included within the Final Judgment.  In so doing, however, the Arch Agreement seeks to preserve Arch's ability to pursue Auchter and Auchter's insurers in relation to the "delay issues, punch list issues, defects and/or deficiencies that were raised in the

Litigation", the settlement funds paid to RAP and certain attorneys' fees, costs and expert expenses.  *See* **Exhibit "Q"** at p.2, Para. 3.

150.   The burden of apportioning or allocating these damages is on the party seeking to recover from the insurer.

151.   Auchter, its alleged or actual assignees and/or subrogees were, or should have been, aware of the need to allocate and/or apportion the amounts awarded in the Final Judgment prior to seeking any recovery under the Amerisure Policies, but failed to do so.

152.   Arch, likewise, was aware of the need to allocate and/or apportion the amounts awarded in the Final Judgment and/or the Arch Agreement, as a requirement to seeking any recovery under the Amerisure Policies.  No allocation or apportionment of the Final Judgment or the Arch Agreement was requested or performed.

153.   Thus, to the extent that Auchter, its alleged or actual assignees, subrogees, or any party seeking to recover amounts awarded for the delay damages in the Final Judgment and/or the Arch Agreement fails to allocate covered "property damage", they are barred from any recovery under the Amerisure Policies.

**WHEREFORE**, Amerisure Insurance Company and Amerisure Mutual Insurance Company respectfully request entry of a declaratory judgment finding

and declaring that Amerisure has no indemnity obligation in connection with the award in the Final Judgment and/or the Arch Agreement for the delay damages for failure to complete the Project as per the contractual requirements, together with costs and any other further relief this Court deems just and proper.

**COUNT VI**
**NO DUTY TO INDEMNIFY UNDER**
**ENDORSEMENT "C" OF THE CGL POLICIES –**
**FINAL JUDGMENT AMOUNTS AWARDED FOR**
**DELAY DAMAGES FOR THE FAILURE TO**
**COMPLETE CONSTRUCTION BY THE**
**REQUIRED DATE**

154.   Amerisure incorporates the allegations set forth within Paragraphs 1 through 72 as if fully set forth herein.

155.   The CGL Policies also include Endorsement "C" – Contractors Professional Services Liability Coverage.   Any coverage afforded under Endorsement "C" is separate from, and not in addition to, that provided under Coverage "A".  *See* **Exhibits "M"** & **"N"**.

156.   The Endorsement "C" Insuring Agreement states:   "[w]e will pay those sums that the insured becomes legally obligated to pay as damages arising out of any 'negligent act' committed by the insured . . . to which the insurance applies."  "'Negligent act' means an error or omission by the insured arising out of the performance of or failure to perform 'Contractors Professional Services', including 'Design Services' and 'Construction Management Services'", and must

"occur during the policy period".  **Exhibits "M" & "N"**.

157.   Insureds and their assignees and subrogees carry the burden of bringing a claim within the ambit of coverage.

158.   The Final Judgment awards amounts for damages due to delay from work not completed at the Project by the contractually-mandated date (*e.g.,* Auchter's failure to depict or otherwise describe in its schedule updates how actual events affected the critical path of the Project completion contributed to lost rents in the tower, lost parking revenues, extended contract administration charges from RDB, extended construction management services for the owner's representative, additional construction loan interest from January 2007 through July 2007, and loss of use of monies resulting from mortgage requirements for maintaining an interest loan reserve), which do not fall within the Endorsement "C" Insuring Agreement, or are otherwise excluded.  *See* **Exhibit "A"**, pp. 35-39, 55.

159.   All of the amounts awarded for the delay damages for failure to complete as defined in the contract do not qualify as "damage" caused by a "negligent act" under the Contractors Professional Services Liability Coverage Endorsement.

160.   The mere repair and replacement of the work itself does not constitute "damage" arising out of a "negligent act" under a Contractors Professional Services Liability Coverage Endorsement.

161.   Additionally, mere breach of contract claims (*e.g.,* failure to perform, failure to complete) do not qualify as "damage" arising out of a "negligent act" under a Contractors Professional Services Liability Coverage Endorsement.

162.   Separate and apart from the requirements of the Endorsement "C" Insuring Agreement, the Contractors Professional Services Liability Coverage Endorsement also contains several applicable exclusions barring coverage for the amounts awarded for the delay damages, including but not limited to: the "insolvency or bankruptcy" exclusion; "damages due to delay" exclusion; "Design Services" exclusion; and the "Expected or Intended" exclusion.

163.   As all elements awarded for the delay damages for failure to complete by the contract date are beyond the coverage of the Contractors Professional Services Liability Coverage Endorsement, Amerisure possesses no duty to indemnify Auchter, its assigns and/or subrogees  for all such amounts awarded in the Final Judgment.

164.   Alternatively, even if certain amounts awarded for the delay damages in the Final Judgment could arguably fall within the ambit of coverage under the Contractors Professional Services Liability Coverage Endorsement, and were not otherwise excluded, the Final Judgment does not apportion or allocate what portion of the Final Judgment is attributable to coverage amounts (*i.e.,* "damage" arising out of a "negligent act"), and what portion is attributable to repair and/or

58

replacement of the insured's, or any subcontractors working on its behalf, work and/or their breach of contract.

165.   After entry of the Final Judgment, Arch entered into the Arch Agreement with RAP.  *See* **Exhibit "Q"**.  In the Arch Agreement, Arch paid $16.8 Million to RAP in exchange for a release of certain claims included within the Final Judgment.   In so doing, however, the Arch agreement seeks to preserve Arch's ability to pursue Auchter and Auchter's insurers in relation to the "delay issues, punch list issues, defects and/or deficiencies that were raised in the Litigation", the settlement funds paid to RAP and certain attorneys' fees, costs and expert expenses.  *See* **Exhibit "Q"** at p.2, Para. 3.

166.   The burden of apportioning or allocating these damages is on the party seeking to recover from the insurer.

167.   Auchter, its alleged or actual assignees and/or subrogees were, or should have been, aware of the need to allocate and/or apportion the amounts awarded in the Final Judgment as a requirement to seek any recovery under the Contractors Professional Services Liability Coverage Endorsement, but failed to do so.

168.   Arch, likewise, was aware of the need to allocate and/or apportion the amounts awarded in the Final Judgment and/or the Arch Agreement, as a requirement to seeking any recovery under the Amerisure Policies.  No allocation

or apportionment of the Final Judgment or the Arch Agreement was requested or performed.

169.   Thus, to the extent that Auchter, its alleged or actual assignees, subrogees, or any party seeking to recover amounts awarded for the delay damages in the Final Judgment and/or the Arch Agreement fails to allocate covered "damage" arising out of "negligent acts", they are barred from any recovery under the Contractors Professional Services Liability Coverage Endorsement.

**WHEREFORE**, Amerisure Insurance Company and Amerisure Mutual Insurance Company respectfully request entry of a declaratory judgment finding and declaring that Amerisure has no indemnity obligation in connection with the award in the Final Judgment and/or the Arch Agreement for the delay damages for failing to complete the Project by the contract deadline, together with costs and any other further relief this Court deems just and proper.

## COUNT VII
## DECLARATORY JUDGMENT – THE
## LANDMARK PRIMARY POLICIES AFFORD
## PRIMARY COVERAGE TO AUCHTER

170.   Amerisure incorporates the allegations set forth within Paragraphs 1 through 72 as if fully set forth herein.

171.   In accordance with the requirements of the TSG subcontract, Auchter was, and is currently, an additional insured on the Landmark Primary Policies.  *See*

**Exhibits "B" & "I"** ("This correspondence is to confirm that  [Landmark] has agreed to retain your firm to defend its additional insured The Auchter Company.").

172.   Landmark has acknowledged Auchter's status as an additional insured on the Landmark Primary Policies and agreed to defend Auchter in connection with the Underlying Action.  *See* **Exhibits "H"**, **"I"** & **"J"**.

173.   In addition to requiring Auchter to be named as an additional insured, the TSG subcontract required that the Landmark Primary Policies apply on a "primary and non-contributory basis."  *See* **Exhibit "B"**.

174.   The Landmark Primary Policies state that the coverage afforded to an additional insured "is primary if that is required by written contract, written agreement or written permit."[7] *See* **Exhibits "F"** & **"G"**.

175.   Coverage for Auchter under the Landmark Primary Policies is primary and non-contributory.

176.   Separate and apart from the primary additional insured obligation derived from the TSG subcontract, the CGL policies apply as excess insurance "over any other insurance, whether primary or excess, contingent or on any other

---

[7] The language in the second Landmark Primary Policy differs slightly, but the primary requirement remains, *inter alia*, "if you are required by written contract to provide primary insurance, this policy shall be primary and SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS, 4. Other Insurance does not apply, but only with respect to coverage provided by this policy.  **Exhibit "G".**

basis: . . . (5) That is valid and collectible insurance available to you as an insured under any other policy." *See* **Exhibits "M"** & **"N"**.

177.   When the CGL policies are excess, Amerisure "will have no duty under Coverages A or B to defend any claim or "suit" that any other insurer has a duty to defend." **Exhibits "M"** & **"N"**.

178.   The Landmark Primary Policies are valid, collectible and apply for purposes of defending Auchter in connection with the Underlying Action. *See* **Exhibits "H"**, **"I"** & **"J".**

179.   Landmark, therefore, owed, and currently owes, Auchter a primary duty to defend and indemnify it in connection with the Underlying Action, which includes, but is not limited to, the Final Judgment entered therein.

**WHEREFORE**, Amerisure Insurance Company and Amerisure Mutual Insurance Company respectfully request entry of a declaratory judgment finding and declaring that: (1) Landmark owed Auchter a primary duty to defend in connection with the Underlying Action beginning on August 11, 2010; (2) Landmark owes Auchter a primary duty to indemnify in connection the Underlying Action, which includes, but is not limited to, the Final Judgment entered therein; (3) the CGL policies apply, if at all, on an excess basis following exhaustion of the Landmark Primary Policies; (4) for attorneys' fees and costs incurred to prosecute this action as the subrogee of Auchter; (5) for costs; (6) for

any other relief this Court deems just and proper.

## COUNT VIII
## CONVENTIONAL SUBROGATION FOR
## REIMBURSEMENT OF DEFENSE COSTS BASED
## ON LANDMARK'S BREACH OF ITS DUTY TO
## DEFEND AUCHTER

180.   Amerisure incorporates the allegations set forth within Paragraphs 1 through 72 and 170 to 179 as if fully set forth herein.

181.   In accordance with the requirements of the TSG subcontract, Auchter was, and is currently, an additional insured on the Landmark Primary Policies. *See* **Exhibits "B"** & **"I"** ("This correspondence is to confirm that [Landmark] has agreed to retain your firm to defend its additional insured The Auchter Company.").

182.   In addition to requiring Auchter to be named as an additional insured, the TSG subcontract required that the Landmark Primary Policies apply on a "primary and non-contributory basis." *See* **Exhibit "B"**.

183.   Landmark breached that duty by failing to defend Auchter in the Underlying Action or to pay any portion of its defense costs.

184.   The CGL policies afford Auchter excess coverage when there is "valid and collectible insurance available to [Auchter]". **Exhibits "M"** & **"N"**.

185.   When the CGL policies are excess, "[Amerisure] will have no duty under Coverages A or B to defend any claim or 'suit' that any other insurer

[Landmark] has a duty to defend." **Exhibits "M" & "N"**.

186.   Insofar as Landmark was primarily liable for defending Auchter but breached its duty to defend Auchter, Amerisure defended Auchter in the Underlying Action to prevent any injustice or prejudice to Auchter.

187.   In having paid a debt Amerisure was not primarily liable for, Amerisure is entitled to "[Auchter's] rights against all those other insurers [*e.g.*, Landmark]." *See* **Exhibits "M" & "N"**.

188.   The CGL policies further provide that if Auchter "has rights to recover all or a part of any payment [Amerisure] made under this Coverage Part, those rights are transferred to [Amerisure]." **Exhibits "M" & "N"**.

189.   Landmark, despite repeated requests to do so, has refused to reimburse Amerisure for those defense costs paid in defending Auchter in the Underlying Action.

190.   From August 11, 2010, Amerisure paid the sum of $1,196,263.90 in defense costs to defend Auchter in the Underlying Action.  The amounts paid by Amerisure to defend Auchter were reasonable and necessary.  Amerisure is entitled, via the doctrine of Conventional or Legal Subrogation, to recover this amount, plus interest and attorneys' fees in prosecuting this action from Landmark.

**WHEREFORE**, Amerisure Insurance Company and Amerisure Mutual Insurance Company respectfully request entry of a judgment finding and declaring

that: (1) Landmark owed Auchter a primary duty to defend in connection with the Underlying Action beginning on August 11, 2010; (2) Landmark breached its duty to defend Auchter in connection with the Underlying Action; (3) the CGL policies apply, if at all, on an excess basis following exhaustion of the Landmark Primary Policies; (4) Landmark owes Amerisure the sum of $1,196,263.90 for all defense costs paid in defending Auchter in the Underlying Action from August 11, 2010 to present day; (5) for pre- and post-judgment interest on the past due and owing defense costs; (6) for attorneys' fees and costs incurred to prosecute this action as the subrogee of Auchter; (7) for costs; and (8) for any other relief this Court deems just and proper.

**COUNT IX**
**EQUITABLE SUBROGATION FOR**
**REIMBURSEMENT OF DEFENSE COSTS BASED**
**ON LANDMARK'S BREACH OF ITS DUTY TO**
**DEFEND AUCHTER**

191.   Amerisure incorporates the allegations set forth within Paragraphs 1 through 72 and 170 to 179 as if fully set forth herein.

192.   In accordance with the requirements of the TSG subcontract, Auchter was and is an additional insured on the Landmark Primary Policies.  *See* **Exhibits "B"** & **"I"** ("This correspondence is to confirm that  [Landmark] has agreed to retain your firm to defend its additional insured The Auchter Company.").

193.   In addition to requiring Auchter to be named as an additional insured,

the TSG subcontract required that the Landmark Primary Policies apply on a "primary and non-contributory basis." *See* **Exhibit "B"**.

194.   Landmark breached its primary duty to defend by failing to defend Auchter in the Underlying Action.

195.   The CGL policies afford Auchter excess coverage when there is "valid and collectible insurance available to [Auchter]". **Exhibits "M"** & **"N"**.

196.   When the Amerisure CGL policies are excess, "[Amerisure] will have no duty under Coverages A or B to defend any claim or "suit" that any other insurer [Landmark] has a duty to defend." **Exhibits "M"** & **"N"**.

197.   Insofar as Landmark was primarily liable for defending Auchter but breached its duty to defend Auchter, Amerisure defended Auchter in the Underlying Action to prevent any injustice or prejudice to Auchter.

198.   In having paid a debt Amerisure was not primarily liable for, Amerisure is entitled to "[Auchter's] rights against all those other insurers [*e.g.,* Landmark]." *See* **Exhibits "M"** & **"N"**.

199.   Landmark, despite repeated requests to do so, has refused to reimburse Amerisure for those defense costs paid in defending Auchter in the Underlying Action.

200.   From August 11, 2010, Amerisure paid the sum of $1,196,263.90 in defense costs to defend Auchter in the Underlying Action.  The amounts paid by

Amerisure to defend Auchter were reasonable and necessary. Amerisure is entitled, via the doctrine of Equitable Subrogation, to recover this amount, plus pre- and post-judgment interest and attorneys' fees in prosecuting this action from Landmark.

**WHEREFORE**, Amerisure Insurance Company and Amerisure Mutual Insurance Company respectfully request entry of a judgment finding and declaring that: (1) Landmark owed Auchter a primary duty to defend in connection with the Underlying Action beginning on August 11, 2010; (2) Landmark breached its duty to defend Auchter in connection with the Underlying Action; (3) the CGL policies apply, if at all, on an excess basis following exhaustion of the Landmark Primary Policies; (4) Landmark owes Amerisure the sum of $1,196,263.90 for all defense costs paid in defending Auchter in the Underlying Action; (5) for pre- and post-judgment interest on the past due and owing defense costs; (6) for attorneys' fees and costs incurred to prosecute this action as subrogee of Auchter; and (7) for any other relief this Court deems just and proper.

**COUNT X**
**ALTERNATIVELY, EQUITABLE**
**CONTRIBUTION FOR PRO-RATA SHARE OF**
**DEFENSE COSTS BASED ON LANDMARK'S**
**BREACH OF ITS DUTY TO DEFEND AUCHTER**

201.  Amerisure incorporates the allegations set forth within Paragraphs 1 through 72 and 170 to 179 as if fully set forth herein.  This Count is pled in the

alternative and without prejudice to Amerisure's claim for full reimbursement.

202.   In accordance with the requirements of the TSG subcontract, Auchter was and is an additional insured on the Landmark Primary Policies.  *See* **Exhibits "B" & "I"** ("This correspondence is to confirm that  [Landmark] has agreed to retain your firm to defend its additional insured The Auchter Company.").

203.   In addition to requiring Auchter to be named as an additional insured, the TSG subcontract required that the Landmark Primary Policies apply on a "primary and non-contributory basis."  *See* **Exhibit "B"**.

204.   Landmark breached its primary duty to defend by failing to defend Auchter in the Underlying Action.

205.   If, however, it is determined that Landmark and Amerisure share the duty to defend Auchter in the Underlying Action, Landmark is responsible for payment of its pro-rata share of the defense cost incurred in defending Auchter.

206.   Insofar as Landmark breached its duty to defend Auchter, Amerisure defended Auchter in the Underlying Action to prevent any injustice or prejudice to Auchter.

207.   In having paid a debt Amerisure was not solely liable for, Amerisure is entitled to seek contribution from Landmark for its pro-rata share of defense costs owed by Landmark.

208.   Landmark, despite repeated requests to do so, has refused to pay any

portion of Auchter's defense costs incurred in the Underlying Action.

209.   From August 11, 2010, Amerisure paid the sum of $1,196,263.90 in defense costs to defend Auchter in the Underlying Action. The amounts paid by Amerisure to defend Auchter were reasonable and necessary.  Amerisure, in the alternative, is therefore entitled, via the doctrine of Equitable Contribution, to recover from Landmark its pro rata share of defense costs, plus pre- and post-judgment interest and attorneys' fees in prosecuting this action from Landmark.

**WHEREFORE**, Amerisure Insurance Company and Amerisure Mutual Insurance Company respectfully request, in the alternative, entry of a judgment finding and declaring that: (1) Landmark owed Auchter a duty to defend in connection with the Underlying Action beginning on August 11, 2010; (2) Landmark breached its duty to defend Auchter in connection with the Underlying Action; (3) the CGL policies of Landmark and Amerisure apply, at least, on a pro rata basis; (4) Landmark owes Amerisure one-half of the sum of $1,196,263.90 for all defense costs paid in defending Auchter in the Underlying Action; (5) for pre- and post-judgment interest on the past due and owing defense costs; (6) for attorneys' fees and costs incurred to prosecute this action as subrogee of Auchter; and (7) for any other relief this Court deems just and proper.

## **JURY DEMAND**

Amerisure Insurance Company and Amerisure Mutual Insurance Company

hereby demand a jury trial as to all issues so triable.


Dated: this 11th day of December, 2015


Respectfully submitted:

/s/ Donald E. Elder
*Attorney for Plaintiffs, Amerisure Insurance*
*Company and Amerisure Mutual Insurance*
*Company*

Donald E. Elder
Brett L. Warning
Emerson & Elder, P.C.
53 West Jackson Blvd.
The Monadnock Building, Suite 526
Chicago, Illinois 60604
Direct Dial: (312) 520-2502
Email: dee@emersonelder.com
Email: brett@emersonelder.com