# EXHIBIT A

## OPINION OF STEVEN C. SHIMP, P.E. REGARDING FAILURE OF THE AUCHTER COMPANY TO PROVIDE CONTRACTOR'S PROFESSIONAL SERVICES

1. This opinion is based upon my personal knowledge. I am over the age of eighteen years old and competent to testify.

2. My name is Steven C. Shimp.

3. I am a licensed General Contractor (CGCA21611, inactive as of 8/31/2016) and Professional Engineer (PE32331) in the State of Florida.

4. My expertise lies in multiple aspects of the business of general contracting, general construction contracts, financing of construction projects and project funding practices in the construction industry. I am currently president and owner of Shimp Services Company, am educated as a construction professional, have served as a Miami Branch Director of the Federal Reserve Bank of Atlanta, have served as a member of Judicial Nominating Commission of the 20th Judicial Circuit in Florida, and have served as a member of the Panel of Neutrals of the American Arbitration Association.

5. From 1982 to 2007, I was founder and president of a commercial general contracting company that primarily operated in Florida. The company completed over $190,000,000 of contracts in 2007. During my tenure, I managed any litigations of the company. In the course of that career, I testified under oath in about five litigations or arbitrations, was deposed not less than five times and no more than ten times. I completed one trial, two arbitrations, and participated in about five mediations that resulted in settlements.

6. In my capacity as a testifying expert in the matter of Riverside Partners, LTD ("RAP") v. The Auchter Company ("Auchter") and Arch Insurance ("Arch"), I have inspected the thirteen (13) story office building known as the Riverside Avenue Partners Project a/k/a

1

the "Everbank Building" located at 501 Riverside Avenue, in Jacksonville, Florida (the "Project"). I also conducted extensive reviews of Project records as maintained by Auchter regarding the Project and various documents produced by RAP, its architect Rolland, DelValle, & Bradley, Inc. ("RDB") and its engineers. Documents reviewed include, but are not limited to, the contract, plans and specifications for the project, multiple change orders to the contract, various applications for payment, correspondence between various law firms related to the litigation, various filings in the court by the Parties, preliminary change order ("PCO") files, various subcontractor files maintained by Auchter, extensive correspondence between the parties, requests for information ("RFI's"), contracts between RAP and others as relate to tenant improvements within the Project, accident/incident investigation reports, punch-list notes, various progress reports generated by Auchter personnel and/or the Architect, notices of commencement, building permits, various utility records, various permit related documents and e-mail correspondence among the various parties throughout the course of the Project. Subsequently, I have reviewed the final judgment rendered in Case 16-2010-CA-006433 in the Florida Fourth Judicial Circuit Court resulting in litigation between RAP, Arch, TAC and various subcontractors to TAC.

7. The Court found that I possessed expert knowledge with respect to construction delays, construction processes, contract administration, and construction industry standards. Specifically was noted experience in pertinent aspects of general contracting, general construction contracts, financing of construction projects, project funding practices in the construction industry, and processing payments and credits during the lifecycle of multi-tenant construction projects.

2

8. As a result of my work enumerated above, I have personal knowledge of the construction of the Project and the activities of the various parties including those of various RAP personnel, RDB personnel and TAC personnel.

9. The Project generally can be described as a 13-story rectangular office tower attached to a two story parking garage. On top of the office tower is a mechanical penthouse constructed above the main building roof that encloses elevator and HVAC equipment. The footprint of the office tower is 124'x204'. The exterior walls of the office tower were primarily constructed using curtainwall systems, storefront windows, and precast concrete panels for the Project. TSG Industries, Inc. ("TSG"), as a subcontractor to Auchter, built the curtainwall systems and storefront window systems.

10. Various provisions of the construction contract between TAC and RAP for the project required TAC to provide contractors professional services that, in the aggregate, ensured quality control in the completion of the work. These requirements include but are not limited to:

    a. To provide construction supervision per the General Conditions of the Contract for Construction Document A201 ("General Conditions"), section 3.3.

    b. To provide tests and inspections per the General Conditions, section 13.5.

    c. To provide quality control of the project, including monitoring quality control over workmanship, specifications, section 01400, 1.3 and testing services by independent firms, specifications, section 01400, 1.5.

11. Specific quality control requirements as relates to the work of TSG, the glazed curtainwall systems, storefront windows, and storefront work, included:

3

a. To provide a system that allowed no water leakage when measured by certain professional references of the specifications, section 08920, 1.5, g and that internally drained, moving water internal to the system to the exterior, specification section 08920, 1.5, i.

b. To provide a mock-up that illustrated the component assembly including glazing material, weep drainage system, anchors and perimeter sealant, specification section 1.10.

c. To provide a pre-installation meeting, specification section 1.11.

d. To provide field quality control testing to relevant industry standards, including AAMA FC-1, ASTM E1105, and AAMA 501.2, specification section 3.4.

12. RAP took occupancy and used the building for its intended purpose as a rental property over a period of time starting with the first tenant on 2/27/2007. By 10/26/2007, all eleven tenants had moved into the building. At trial, RAP's scheduling expert testified that the substantial occupancy date was August 27, 2007.

13. After occupancy and beneficial use in the 3rd quarter of 2007, RAP experienced water intrusion multiple times through the exterior walls of the tower. A "leak log" was kept by RAP, documenting these intrusions. A graphic presented at trial (Exhibit Mark Baker 700) depicted the locations and dates of recorded leaks starting on 9/17/2007 (when all but two of eleven tenants had taken occupancy) and continuing into 2010. That log demonstrates that water intrusion events continued for an extended time and occurred in multiple areas of the building and on multiple floors at the exterior walls after occupancy.

14. Water intrusion damaged drywall and other work installed by tenant contractors. E-mail correspondence between RAP, its tenants and its building management company together

4

with various photographs reviewed during my initial engagement demonstrated that water damage to finished spaces occurred.

15. As the water intrusion continued, RAP engaged IBA Consultants, Inc. ("IBA") who conducted surveys and localized testing of approximately 50% of the window wall and curtain wall. The test results and subsequent inspections resulted in an IBA opinion that the use of four piece gaskets and wedges in lieu of factory molded corner gaskets, the substitution of end dams in lieu of defectors at intermediate horizontals, and missing or inappropriate use of sealants allowed excessive amounts of water to enter the system and negated the ability of the internal drainage system to properly function, resulting in water intrusion into the building.

16. IBA furthermore opined that the cost to remedy the defective work was $4,825,313.00.

17. In Circuit Court litigation between RAP, TAC, Arch, TSG and others, RAP claimed the $4,825,313 in remedial costs and a further $241,720.01 in related costs as a result of TSG's defective work.

18. In its final judgment dated November 5, 2014, the court awarded the full damages claimed to RAP in a judgment against TAC.

19. In my extensive review of documents regarding this matter as referenced in paragraph 6 above, I am aware of no mock-up provided by TAC that fulfilled the provisions of the specifications as relates to the glazing materials, weep drainage system and perimeter sealants. Furthermore, I found no record of a pre-installation meeting for the work of TSG, despite that I reviewed all meeting minutes and field inspection reports of the project by the architect. Last, I am aware that TAC never conducted field quality control testing as called for in the specifications before or after leaks became known.

5

20. It is my opinion that:

   a. TAC provided insufficient supervision on the RAP project, rendering it virtually impossible to provide suitable inspection services of the work.

   b. That the failure of TAC to provide a suitable mock-up and pre-installation meeting negated two key opportunities to find the defective work of TSG in advance.

   c. That the leakage experienced on the project was sufficient to make it appropriate to provide testing as was called for in the specifications and, despite that, TAC ordered no fulfilling testing.

   d. That the provision of the above three services, among others, are professional services that are necessary and incidental to the conduct of a general contracting business.

Executed on this 14th day of October, 2016.

_____
Steven C. Shimp