# EXHIBIT B

## OPINION OF STEVEN C. SHIMP, P.E. REGARDING THE AWARD OF DAMAGES FOR DEFECTIVE WINDOW, STOREFRONT AND CURTAINWALL

1. This opinion is based upon my personal knowledge. I am over the age of eighteen years old and competent to testify.

2. My name is Steven C. Shimp.

3. I am a licensed General Contractor (CGCA21611, inactive as of 8/31/2016) and Professional Engineer (PE32331) in the State of Florida.

4. My expertise lies in multiple aspects of the business of general contracting, general construction contracts, financing of construction projects and project funding practices in the construction industry. I am currently president and owner of Shimp Services Company, am educated as a construction professional, have served as a Miami Branch Director of the Federal Reserve Bank of Atlanta, have served as a member of Judicial Nominating Commission of the 20th Judicial Circuit in Florida, and have served as a member of the Panel of Neutrals of the American Arbitration Association.

5. From 1982 to 2007, I was founder and president of a commercial general contracting company that primarily operated in Florida. The company completed over $190,000,000 of contracts in 2007. During my tenure, I managed any litigations of the company. In the course of that career, I testified under oath in about five litigations or arbitrations, was deposed not less than five times and no more than ten times. I completed one trial, two arbitrations, and participated in about five mediations that resulted in settlements.

6. In my capacity as a testifying expert in the matter of Riverside Partners, LTD ("RAP") v. The Auchter Company ("Auchter") and Arch Insurance ("Arch"), I have inspected the thirteen (13) story office building known as the Riverside Avenue Partners Project a/k/a the "Everbank Building" located at 501 Riverside Avenue, in Jacksonville, Florida (the

1

"Project"). I also conducted extensive reviews of Project records as maintained by Auchter regarding the Project and various documents produced by RAP, its architect Rolland, DelValle, & Bradley, Inc. ("RDB") and its engineers. Documents reviewed include, but are not limited to, the contract, plans and specifications for the project, multiple change orders to the contract, various applications for payment, correspondence between various law firms related to the litigation, various filings in the court by the Parties, preliminary change order ("PCO") files, various subcontractor files maintained by Auchter, extensive correspondence between the parties, requests for information ("RFI's"), contracts between RAP and others as relate to tenant improvements within the Project, accident/incident investigation reports, punch-list notes, various progress reports generated by Auchter personnel and/or the Architect, notices of commencement, building permits, various utility records, various permit related documents and e-mail correspondence among the various parties throughout the course of the Project.

7. The Court found that I possessed expert knowledge with respect to construction delays, construction processes, contract administration, and construction industry standards. Specifically was noted experience in pertinent aspects of general contracting, general construction contracts, financing of construction projects, project funding practices in the construction industry, and processing payments and credits during the lifecycle of multi-tenant construction projects.

8. Subsequent to trial, I have reviewed
    a. the final judgment (the "judgment") rendered in Case 16-2010-CA-006433 in the Florida Fourth Judicial Circuit Court resulting in litigation between RAP, Arch, TAC and various subcontractors to TAC, and

2

    b. Multiple exhibits (#690-#715, #807 and #808) presented during trial in the testimony of Mark Baker, principal of Innovative Building and Architecture Consultants ("IBA"), RAP's testifying expert as to nature of defects and the cost to correct defects in the curtainwall, window and storefront systems of the Project.

    c. Exhibits presented in testimony from Auld & White Constructors, LLC ("Auld & White"), RAP's general contractor for various completion and remedial work, that estimated costs of removing and replacing work of other trades that would be damaged in correcting the defects in the curtainwall, window and storefront systems of the Project.

9. As a result of my previous work enumerated above in paragraph 6 and subsequent review of listed trial documents in paragraph 7, I have personal knowledge of the construction of the Project and the activities of the various parties including those of various RAP personnel, RDB personnel and TAC personnel as well as an understanding of the Court's judgment in this matter and its technical basis.

10. The Project generally can be described as a 13-story rectangular office tower attached to a two story parking garage. On top of the office tower is a mechanical penthouse constructed above the main building roof that encloses elevator and HVAC equipment. The footprint of the office tower is 124'x204'. The exterior walls of the office tower were primarily constructed using curtainwall systems, storefront windows, and precast concrete panels for the Project. TSG Industries, Inc. ("TSG"), as a subcontractor to Auchter, built the curtainwall systems and storefront window systems.

3

11. RAP took occupancy and used the building for its intended purpose as a rental property over a period of time starting with the first tenant on 2/27/2007. By 10/26/2007, all eleven tenants had moved into the building. At trial, RAP's scheduling expert testified that the substantial occupancy date was August 27, 2007.

12. After occupancy and beneficial use in the 3rd quarter of 2007, RAP experienced water intrusion multiple times through the exterior walls of the tower. A "leak log" was kept by RAP, documenting these intrusions. A graphic presented at trial (Exhibit Mark Baker 700) depicted the locations and dates of recorded leaks starting on 9/17/2007 (when all but two of eleven tenants had taken occupancy) and continuing into 2010. That log demonstrates that water intrusion events continued for an extended time and occurred in multiple areas of the building and on multiple floors at the exterior walls after occupancy which caused damage to the occupied tenant spaces.

13. Water intrusion damaged drywall and other work installed by tenant contractors. E-mail correspondence between RAP, its tenants and its building management company together with various photographs reviewed during my initial engagement demonstrated that water damage to finished spaces occurred. Water intrusion into buildings at exterior walls is known to be the source of water damage if not addressed. As these leaks in TSG's work occurred, RAP completed repairs of damaged ceilings, walls, and floors on a leak-by-leak basis as the spaces were being occupied, therefore, repairs damaged work and preventing damage on an on-going basis.

14. As the water intrusion continued, RAP engaged IBA who conducted surveys and localized testing of approximately 50% of the window wall and curtain wall. The test results and subsequent inspections resulted in an IBA opinion that the use of four piece

4

gaskets and wedges in lieu of factory molded corner gaskets, the substitution of end dams in lieu of defectors at intermediate horizontals, and missing or inappropriate use of sealants allowed excessive amounts of water to enter the system and negated the ability of the internal drainage system to properly function, resulting in water intrusion into the tenant spaces inside the building.

15. At trial IBA opined that the cost to remedy the defective work by TSG was $4,825,313. This amount was determined by adding two components:

    a. First, the cost to correct the curtainwall, window and storefront systems by removing all of the glass panels, installing proper gasket, flashings and sealants, reinstalling the glass, and achieving regulatory approvals for the remediated system valued at $3,762,821. This work would be the work of TSG, had they performed the remediation.

    b. Second, the cost to remove drywall and acoustical ceilings on the interior of the building to allow access for the above repairs and the subsequent replacement of these damaged surfaces valued at $1,062,492. The cost included damage to other contractors' work caused by the correction of TSG's work.

16. In Circuit Court litigation between RAP, TAC, Arch, TSG and others, RAP claimed the $4,825,313 in remedial costs and a further $241,720.01 in related costs as a result of TSG's defective work.

17. In its final judgment dated November 5, 2014, the court awarded the full damages claimed by RAP in a judgment against TAC in the amount of $5,067,033.01 and, correspondingly, a judgment against TSG in favor of TAC in a like amount.

18. It is my opinion that:

5

a. The Court's reliance on IBA's diagnostic testing and both non-destructive and destructive inspections was justified.

b. IBA's testimony that, absent correction of the defects, the windows would leak further as a result of gasket shrinkage and would cause continued water damage to the tenant spaces was valid.

c. The methodology presented by IBA to accomplish the remediation, including the damage to the drywall and acoustical work of others resulting from the correction of TSG's work, was the least cost remedy to the defect.

d. IBA's estimate of $3,762,821 to correct TSG's work was reasonable.

e. IBA/Auld & White's estimate of damages to the work of others as necessitated by the correction of TSG's work in the amount of $1,062,492 was reasonable.

Executed on this 14th day of October 2016.

Steven C. Shimp, P.E.

6