UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

AMERISURE INSURANCE COMPANY
and AMERISURE MUTUAL
INSURANCE COMPANY,

        Plaintiffs,

v.                                 Case No. 3:16-cv-407-J-39JRK

THE AUCHTER COMPANY, ARCH
INSURANCE COMPANY, LANDMARK
AMERICAN INSURANCE COMPANY,
TSG INDUSTRIES INC, and B & B OF
DUVAL COMPANIES, INC.,

        Defendants.

_____/

## ORDER

**THIS CAUSE** is before the Court on the following motions: Amerisure Insurance

Company and Amerisure Mutual Insurance Company's ("Amerisure") Motion for

Reconsideration and Reversal of Order on Cross Motions for Partial Summary

Judgment [Doc. 216] (Doc. 224); Amerisure's Motion to Bar the Expert Opinions and

Testimony of Steven C. Shimp at Trial (Doc. 246); Amerisure's Motion for Partial

Summary Judgment against Landmark American Insurance Company ("Landmark")

(Doc. 247); Amerisure's Motion for Partial Summary Judgment against Arch Insurance

Company ("Arch") regarding Claims for Insurance Coverage for the "Punch List" and

"Delay Damage" Components of the Final Judgment (Doc. 248); Landmark's Motion for

Summary Judgment on the Duty to Defend and the Duty to Indemnify Related to the

Equitable Exception (Doc. 249); Landmark's Motion for Summary Judgment on the Duty

to Indemnify (Doc. 250); Amerisure's Objections to the Magistrate Judge's Non-

Dispositive Order (Doc. 257); and Amerisure's Motion for the Entry of a Partial Final Summary Judgment against Landmark (Doc. 271). The Court also considered the responses in opposition to these motions as well as the replies to the responses. (Docs. 230, 258-264, 266, 268-270, 272-274, and 277).

This most recent round of motion practice represents the final portion of dispositive motion practice. Because most of the relevant facts and case law have previously been established, the Court will not recite them in detail. (See, e.g. Docs. 157-58 and 216). The motions seek to establish each party's liability as to various aspects of a long running dispute involving the construction of a 13-story office building, the Riverside Avenue Project (the "Project"). The Project did not go as planned and resulted in a litany of claims, counterclaims, and cross-claims involving, among others, the property owner, the general contractor, and subcontractors in state court (the underlying state action).[1] The matter was eventually resolved following a 28-day non-jury trial that resulted in the following judgment:

> 1.    Judgment is entered in favor of Riverside Avenue Partners, Ltd., and against The Auchter Company in the amount of $11,267,515.75. This judgment shall accrue post judgment interest at the statutory interest rate.
>
> 2.    Judgment is entered in favor of Riverside Avenue Partners, Ltd., and against Arch Insurance Company in the amount of $8,791,460.72. This judgment shall accrue post judgment interest at the statutory interest rate. Consistent with the Court's analysis of the Arch counterclaims against

---

[1] For ease of reference Riverside Avenue Partners Ltd. ("RAP") contracted with the Auchter Company ("Auchter") for Auchter to construct the Project. Auchter obtained insurance through Amerisure while Arch acted as Auchter's surety and guaranteed the obligations of Auchter under the RAP-Auchter contract. Auchter hired subcontractor TSG Industries Inc. ("TSG") to construct the Project's Window System. Auchter's subcontract with TSG required TSG to obtain insurance for itself which named Auchter as an additional insured for all Auchter's projects. TSG obtained that insurance from Landmark.

RAP, this part of the judgment has been reduced based on Arch's entitlement to the remaining Contract balance and Arch's claims for PCO reimbursement and the Auchter fee.

3.    Judgment is entered in favor of Arch Insurance Company and against TSG Industries, Inc. in the amount of $5,067,033.01. This judgment shall accrue post judgment interest at the statutory interest rate.

4.    Judgment is entered in favor of The Auchter Company and Arch Insurance Company and against B&B of Duval in the amount of $263,487.54. This judgment shall accrue post judgment interest at the statutory interest rate.

(Doc. 24-1 at 86-88; Final Judgment). The Final Judgment included $2,586,625.86 in damages that was comprised of the money expended to complete the Project, including "punch list items" and $3,613,856.88 for delay damages. Id. at 52 and 55. Thus, the Final Judgment created the following categories of damages: (1) Window System repair, $5,067,033.01; (2) Punch List completion, $2,586,625.86; and Delay Damages, $3,613,856.88. Id. at 56.

I.    **MOTION FOR RECONSIDERATION AND REVERSAL OF ORDER ON CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT [DOC. 216] (DOC. 224)**

On March 27, 2018, the Court granted Arch's Motion for Summary Judgment (Doc. 160) for indemnity as it pertained to roughly $5,000,000.00 for the repair and replacement of windows (or "Window System").[2] (Doc. 216; Order). That Order also denied Plaintiffs' Motion for Summary Judgment (Doc. 169) on that same issue. Plaintiffs now seek reconsideration of the Order.

Within the Motion, Plaintiffs cite to both Rule 60 and Rule 59 of the Federal Rules of Civil Procedure. Rule 60 allows a court to relieve a party from an order because of

---

[2] This work was originally and defectively performed by TSG.

mistake, inadvertence, surprise, excusable neglect, or for any other reason that justifies relief. Rule 59(e) also allows the Court to relieve a party from an order, but it must be made within twenty-eight days after the entry of judgment. The functions of both Rule 60 and Rule 59 are similar insomuch as they "provide a mechanism for those situations in which relief must be obtained after judgment." Brown v. Spells, No. 7:11-CV-91 HL, 2011 WL 4543905, at *1 (M.D. Ga. Sept. 30, 2011) (quoting Charles Alan Wright et al., § 1489 Amendments With Leave of Court—Amendments after Judgment and Appeal, 6 Fed. Prac. & Proc. Civ. § 1489 (3d ed.)). Because Plaintiffs' Motion was made within twenty-eight days of the Court's Order, the Court will review Plaintiffs' Motion as one for reconsideration under Rule 59(e).[3] See Mahone v. Ray, 326 F.3d 1176, 1178 n.1 (11th Cir. 2003).

Reconsideration is only appropriate where controlling law has changed or new evidence has become available, or where reconsideration is necessary to correct a clear error or prevent manifest injustice. Delaware Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC, 597 F.3d 1374, 1383 (Fed. Cir. 2010). "A motion for reconsideration cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." Richardson v. Johnson, 598 F.3d 734, 740 (11th Cir. 2010) (citation and quotation omitted). "[W]here a party attempts to introduce previously unsubmitted evidence on a motion to reconsider, the court should not grant the motion absent some showing that the evidence was not available during the pendency of the motion." Shuford v. Fid. Nat'l Prop. & Cas. Ins. Co., 508 F.3d 1337,

---

[3] Whether the Court's analysis is made under Rule 60 or 59(e), the conclusion is the same.

1345 (11th Cir. 2007) (citation and quotation omitted). Indeed, "a reconsideration of a previous order is an extraordinary remedy to be employed sparingly." <u>Sussman v. Salem, Saxon & Nielsen, P.A.</u>, 153 F.R.D. 689, 694 (M.D. Fla. 1994) (internal citations omitted). Here, Plaintiffs fail to offer newly available evidence; the controlling law has not changed; the Court finds no mistake, inadvertence, surprise, or excusable neglect; and there is no clear error or manifest injustice in the Court's Order or any other reason to justify the relief requested.

While Plaintiffs cite to "new" evidence in the form of deposition testimony about a settlement agreement in one of their arguments for reconsideration (Motion at 12), the evidence needed for Plaintiffs' argument was in existence years before the Court's Order. (Docs. 24.17 and 169.1). In fact, Plaintiffs relied on this evidence in framing other arguments in their motion for summary judgment. (Doc. 169 at 2 n.1). While Plaintiffs argue this evidence needed to be explored more fully before they could fully brief their argument as to allocation, Plaintiffs had several options available to them including seeking to postpone a ruling on summary judgment until they could develop more evidence through deposition testimony. Instead, Plaintiffs presented no argument as to allocation in either their Motion for Summary Judgment or their responses in opposition. It would be inappropriate for the Court to consider Plaintiffs' argument now. <u>See</u> <u>Wilchombe v. TeeVee Toons, Inc.</u>, 555 F.3d 949, 957 (11th Cir. 2009).

## II.  AMERISURE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST LANDMARK AMERICAN INSURANCE COMPANY (DOC. 247)

Amerisure seeks to establish that Landmark is the primary insurer responsible for paying for damages in connection with the Window System. (Doc. 247 at 11).[4] Landmark responds by claiming that it never had the duty to defend anyone and that property damage as contemplated by its policies in light of Georgia law never occurred. (Doc. 258 at 1-2). The Court previously explained that Landmark had a duty to defend Auchter in the underlying action and that Landmark's role is primary to that of Amerisure. (See Doc. 267 at 28). For the reasons explained in its previous Order (Doc. 216) and because Landmark failed to present anything that undermines the Court's previous Order, Landmark has a duty to indemnify Arch for the costs to repair the Window System. For the reasons explained below, the Court also finds that the undisputed evidence establishes both an occurrence and property damage such that coverage pursuant to Landmark's policies is invoked. This coverage requires Landmark to indemnify Arch for an amount up to Landmark's policy limits.

## III.  LANDMARK'S MOTION FOR SUMMARY JUDGMENT ON THE DUTY TO DEFEND AND THE DUTY TO INDEMNIFY RELATED TO THE EQUITABLE EXCEPTION (DOC. 249)

Landmark argues that an extrinsic fact to the Complaint in the underlying case demonstrates that it had no duty to defend its insureds, TSG and Auchter. (Doc. 249 at 1-2). Landmark goes on to conclude that because it had no duty to defend its insureds,

---

[4] In pursuing this motion, Amerisure does not abandon its previous arguments that it did not have any responsibility to defend or indemnify Arch.

it also has no duty to indemnify others for damages caused by TSG or Auchter. Id. at 2. Landmark cites to the December 25, 2006 water intrusion event that was paid by Auchter's risk insurer Zurich. Id. at 10. Landmark's argument is that because the water intrusion event was the only one implicating the windows as the cause of the water intrusion and because Zurich paid that claim, there is nothing left that could support a claim that Landmark had a duty defend its insureds. Id. at 10-11. Without a duty to defend, Landmark claims it has no duty to indemnify.

The Court has already determined that the December 2006 water intrusion event qualifies as an occurrence and that this occurrence took place during a period of Landmark's coverage and resulted in property damage that fairly rendered the RAP Complaint as a document invoking Landmark's duty to defend. (Docs. 158 at 42 and Doc. 267 at 17-19); see also E.S.Y., Inc. v. Scottsdale Ins. Co., 139 F. Supp. 3d 1341, 1352 (S.D. Fla. 2015) ("As in any other insurance policy interpretation context, doubts as to whether a duty to defend exists are resolved in favor of the insured, and exclusionary clauses in insurance contracts are to be construed liberally in favor of the insured.") (internal quotations and alteration omitted).

Landmark acknowledges that "an insurer's obligation to defend is determined solely by the claimant's complaint if suit has been filed," but claims "there are some natural exceptions to this where an insurer's claim that there is no duty to defend is based on factual issues that would not normally be alleged in the underlying complaint." Response at 11 (citing Higgins v. State Farm Fire & Cas. Co., 894 So. 2d 5, 10 & n.2 (Fla. 2004)). Landmark's position on this issue relies on the premise that Zurich's payment for part of the damages of the 2006 water intrusion event means that RAP

could recover nothing in excess of what Zurich provided and that because Zurich paid, Landmark was not the primary insurer. Response at 13.

Landmark's position fails because Zurich may have paid for the claim for a number of reasons, including mistake. Moreover, Zurich's payment does not necessarily implicate Landmark's legal duty to defend. Accord. Landmark Am. Ins. Co. v. Khan, 307 Ga. App. 609, 612, 705 S.E.2d 707, 710 (2011) ("Construction and interpretation of [an insurance] contract are matters of law for the court . . . .") (internal quotations omitted). Therefore, it is not the type of allegation that, if added into RAP's Amended Complaint, would render coverage inapplicable. See Mt. Hawley Ins. Co. v. Tactic Sec. Enf't, Inc., No. 616CV1425ORL40TBS, 2017 WL 8316925, at *6 (M.D. Fla. Sept. 28, 2017), report and recommendation adopted, No. 616CV1425ORL40TBS, 2017 WL 6947453 (M.D. Fla. Nov. 15, 2017) ("[Higgins] is not a holding that allows for denial based on any and all facts that were not alleged, nor facts that are contrary to facts that are alleged.") (emphasis in original). To interpret so broadly the exception to the general rule that the duty to defend is determined from the face of the complaint alone "would swallow the general rule entirely and would serve to conflate the analysis of the duty to defend with the duty to indemnify." Mt. Hawley Ins. Co., 2017 WL 8316925, at *7. The narrow exception mentioned in Higgins applies when an undisputable and unalleged fact unambiguously defeats coverage, and Zurich's payment is not one of those facts. Furthermore, Landmark offers no Georgia law that would support its position, and this Court finds none. S. Guar. Ins. Co. v. Dowse, 278 Ga. 674, 676, 605 S.E.2d 27, 29 (2004) ("[A]n insurer has a correlative duty to defend its insured against all claims covered under a policy, even those that are groundless, false, or fraudulent.")

- 8 -

Landmark also fails to explain how the allegations of subsequent events, such as the September 2007 water intrusion event, would not also invoke Landmark's duty to defend without considering other extrinsic evidence such as whether work was ongoing in some manner. See (Doc. 201.1 at 6 ("On September 17, 2007, substantial water damage occurred . . . [and] [w]ater intrusion at various locations continued through rain events through 2007 and into 2008)). Even had RAP's Amended Complaint contained an allegation that Zurich paid for at least part of the December 2006 water intrusion event, it would not defeat Landmark's duty to defend.[5] Consequently, the Court cannot find that Landmark is absolved from its duty to indemnify on the basis that it has no duty to defend.[6]

---

[5] Landmark incorrectly claims that the Court "already ruled[ ] that the December 25, 2006 water intrusion allegations [are] the only place RAP's Amended Complaint specifies the windows as the cause of water intrusion." (Doc. 249 at 11 (citing Doc. 158 at 41)). In actuality, the Court noted that water intrusion events in 2007 "do not specify the windows as the cause . . . and appear to relate to events that occurred after TSG was completed." The Court stopped short of stating that these allegations definitively preclude coverage under the Landmark policies. Moreover, the Court's statement does not change the law that allegations in a complaint whose construction may or may not invoke coverage nevertheless may invoke the insurer's duty to defend. Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc., 268 Ga. 564, 565, 490 S.E.2d 374, 376 (1997) ("[T]he insurer is obligated to defend where, as here, the allegations of the complaint against the insured are ambiguous or incomplete with respect to the issue of insurance coverage."); see also Pennsylvania Lumbermens Mut. Ins. Co. v. Indiana Lumbermens Mut. Ins. Co., 43 So. 3d 182, 186 (Fla. 4th DCA 2010) ("The duty to defend arises when the complaint alleges facts which create potential coverage.") (emphasis added).

[6] Landmark reasserts its argument that there was never an occurrence triggering coverage because Zurich paid for the only known water intrusion that occurred during the coverage period. For the reasons explained in this Order, that argument must fail.

IV.    **LANDMARK AMERICAN INSURANCE COMPANY'S MOTION FOR**
       **SUMMARY JUDGMENT ON THE DUTY TO INDEMNIFY (DOC. 250)**

a.    Property Damage

Landmark argues that Georgia law requires the Court to declare that Landmark does not have a duty to indemnify any other party for damages arising from the underlying state court action. The Court already determined that the costs for damages associated with the faulty installation of the Window System are covered by the Amerisure policies which are substantially similar to the Landmark policies. (Doc. 216 at 59); (Doc. 267 at 24). The Court also determined that Landmark's policies were primary over Amerisure's policies. (Doc. 267 at 28). However, as Landmark notes, the Court's determination that Amerisure's policies covered repair of the Window System as well as the property damaged by its faulty installation turned in large part on the Eleventh Circuit Court of Appeals published opinion in <u>Carithers v. Mid-Continent Cas. Co.</u>, 782 F.3d 1240 (11th Cir. 2015). <u>Carithers</u> makes it clear that pursuant to Florida law the insurer generally does not have to repair defective work performed by the subcontractor whom is insured. <u>Carithers</u>, 782 F.3d at 1249 (reiterating that a "sub-contractor's defective work . . . [that] did not cause damage to any other property," did not constitute "property damage" as contemplated by the insurance policy). However, when a contractor's defective work causes damage to other property and the defective work must be remedied to repair the other property then repairs to the contractor's defective work are covered by the policy. <u>Id.</u> at 1251.

In this case, the Court has already determined that TSG's faulty workmanship for its work on the Window System caused damage to other property and that the Window

System had to be repaired in order to repair the other property. Consistent with Carither's, the Court held that costs to repair both the Window System and other property were covered by the Amerisure policies which were issued in Florida. Landmark concedes that its policies would also cover the costs to repair both the Window System and the other property damaged by its faulty installation consistent with the Court's interpretation of Amerisure policies if Florida law applied to Landmark's policies.[7]

It is undisputed that Landmark's policies were issued in Georgia and that they are to be interpreted consistent with Georgia law. Landmark argues that this distinction is crucial because Carithers only applies to insurance policies subject to Florida law. In support, Landmark first cites to Trehel Corp. v. Owners Ins. Co., No. 1:12-CV-3366-CAP, 2014 WL 11820250, at *1 (N.D. Ga. Nov. 19, 2014). Trehel recites Georgia's Supreme Court's declaration that "Property or work that is inherently defective because it was produced by faulty workmanship cannot be said to have been physically injured by the very faulty workmanship that brought it into being in the first place." Id. at 3 (quoting Taylor Morrison Servs., Inc. v. HDI-Gerling Am. Ins. Co., 293 Ga. 456, 462, 746 S.E.2d 587, 592 (2013)) (internal quotations omitted). This proposition is no different from that established by Carithers. Importantly, the Georgia Supreme Court did not exclude the possibility that repair to a contractor's faulty work may be covered property damage when necessary to fix other property. Id. ("By the way, we do not go

_____

[7] Like Amerisure, Landmark disagrees with the Court's earlier application of Carithers to extend coverage over the Window System. Landmark simply acknowledges that consistency requires the same outcome if the Court were applying Florida law in interpreting both Landmark and Amerisure's policies.

further in this case and attempt to define the precise line of demarcation between defective and nondefective property or work when both are a part of the same project . . . ."). Because Trehel did not determine that coverage is precluded when otherwise non-covered property damage must be repaired in order to repair covered property damage its application to this case is limited. Id. at 4.

Similarly, Landmark's reliance on First Coast Energy, LLP v. Cincinnati Ins. Co., 227 F. Supp. 3d 1282, 1288 (M.D. Fla. 2017) is unavailing. First Coast Energy applied Georgia law and found that the insured could not recover from an insurer for a contractor's faulty work in manufacturing underground gas tanks. Id. While the Court made no mention of Carithers or its logic, it did not need to because the court found that the covered property damage was subject to a products completed operations hazard exclusion. Id. at 1288-90. This fact alone distinguishes First Coast Energy from the case at bar, where there is damage to covered property outside of the defective workmanship by TSG and that damage was caused by TSG's faulty workmanship. First Coast Energy and the other cases cited by Landmark are not in conflict with Carithers. See Carithers, 782 F.3d at 1249 ("[T]here is a difference between a claim for the costs of repairing or removing defective work, which is not a claim for 'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for 'property damage.'") (internal quotations omitted). When defective work must be corrected to repair the non-defective property damage then the defective work is ushered into the umbrella of covered property damage. Id. at 1251.

Further, Carithers is instructive in resolving Landmark's insurance policy because of Georgia and Florida's symmetrical approaches to interpreting insurance policies.

- 12 -

Taylor Morrison Servs., Inc., 293 Ga. at 462 n.10 (citing with approval Florida law for determining the definition of coverage "property damage"); Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co., 288 Ga. 749, 751, 707 S.E.2d 369, 371 (2011) (relying on Florida law for define the scope of "occurrence"); (see also Doc. 158; March 30, 2017 Order (comparing in detail Florida and Georgia law and concluding the rules of construction are similar)); (Doc. 157; March 30, 2017 Order (holding that Florida and Georgia are "similar with regard to the rules of construction of an insurance contract, duty to defend, and duty to indemnify"). Interestingly, both of the Georgia cases referenced in this paragraph cited approvingly to the Florida Supreme Court's decision in U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 889 (Fla. 2007). Carithers' central holding is predicated on J.S.U.B. See Carithers, 782 F.3d at 1251 (holding that the insurer had to pay "'the costs of repairing damage caused by the defective work . . . .'" which included repair to the defective work) (quoting J.S.U.B., 979 So.2d at 889)).

At best, Trehel lends support to the notion that other property damage must be a result of the subcontractor's negligence before coverage lies. See Trehel Corp., 2014 WL 11820250, at *4 (citing Maxum Indem. Co. v. Jimenez, 318 Ga. App. 669, 671, 734 S.E.2d 499, 503 (2012)). However, Georgia still holds that coverage may exist where "a subcontractor's faulty workmanship [caused] unforeseen or unexpected damage to other property" because this situation involves both an "occurrence" and "property damage." Jimenez, 318 Ga. App. 669 at 671; see also Taylor Morrison Servs., Inc., 293 Ga. 456 at 464 (collecting cases). The Court finds no support for Landmark's assertion

that Georgia, in practice, requires some heightened showing before coverage exists.[8]

Accordingly, Landmark's contention that there was no covered property damage must

fail because damage to other property was indisputably caused by TSG's faulty

workmanship and that the faulty workmanship had to be repaired in order for the other

property to be repaired.[9]

---

[8] To the extent that any negligence was required, it is clear from the factual record that TSG was negligent in installing the Window System.

[9] For these same reasons Landmark's suggested application of the "Business Risk Exclusions" fail. Additionally, the Court previously explained that:

> The evidence does not support a finding that water damage to the tenants' carpeting, ceiling tiles and drywall constituted property damage to Auchter's "work," and establishes "damage to property other than the work performed by [Auchter]." See Auto-Owners Ins. Co. v. Elite Homes, Inc., 676 F. App'x 951, 955 (11th Cir. 2017). Moreover, even if these components are considered Auchter's "work," the "Your Work" exclusion does not apply because the damaged work or the work out of which the damage arises was performed on Auchter's behalf by subcontractor TSG. As to the Property exclusions, there is no evidence to establish that Auchter's and TSG's work was incorrectly performed on walls, carpets and ceilings which are tenant improvements, precluding the application of the j(6) exclusion, or that the property damage to floors, walls and ceilings caused by the water intrusion through the Window System was where Auchter and/or TSG were "performing operations," triggering the j(5) exclusion. Water intrusion damage from leaking windows is not a "business risk" as contemplated by the "Your Work" and the "Property j(5) and j(6) Exclusions," assumed by Auchter and its subcontractor TSG for which it agreed to exclude insurance indemnity protection.

(Doc. 216 at 57-58); accord. Transportation Ins. Co. v. Piedmont Const. Grp., LLC., 301 Ga. App. 17, 21, 686 S.E.2d 824, 828 (2009) (holding that the "purpose of virtually identical business-risk exclusion is to avoid a guarantee of workmanship and it cannot be used to eviscerate coverage" where there is damage beyond defective property).

b.    Occurrence

Next, Landmark argues that there was not an occurrence that triggered coverage under its policies because Zurich paid for the only water intrusion event that occurred during the coverage period. The Court has already rejected that argument. See supra at 8. Moreover, in the underlying case, Judge Jay repeatedly referred to water intrusion problems that resulted in damages beginning in the summer of 2007 through April 2010. (Doc. 24.1 at 10 and 15).[10] It is undisputed that Landmark's policies were in place during the summer of 2007.[11] Additionally, the following evidence presented in the Court's prior Order remains undisputed:

> [W]ater built up in all the windows and leaked into the building as a result of the diverter plate blocking water from exiting through the drain holes. (Doc. 168-2 at 5 (Trial Tr. Vol. 6 at 735)). According to Mr. Baker,
>
> "As water builds up, that unsealed joint is exposed to water, and if water goes through that metal to metal joint, it actually enters into the building and runs down the vertical mullions, which is what we saw during our testing, it's what the tenants reported. It was all very consistent."
>
> Id. at 7 (Trial T. Vol. 6 at 744). He testified that water build up in the gutter "potentially leaks through this joint, which is consistent with what we saw when we tested it and

---

[10] Judge Jay specifically found that the Project began suffering injuries from water intrusion before August 27, 2007, continuing on multiple occasions during the summer of 2007 and for years thereafter. (Doc. 24.1 at 15, 58). Judge Jay's findings of fact placed the blame of the water intrusion on TSG, who failed to, among other things, "use the specified factory gaskets around the windows[,]" deviated from the Project design, and deviated from the state approved product approvals. Id. at 16.

[11] Landmark makes a nuanced argument regarding the state of the law as it pertains to the application of a "manifestation trigger" versus a "continuous trigger." However, this Court need not predict how Georgia will rule on that issue because the undisputed evidence is that water damage was occurring as a result of the faulty Window System installed during the coverage period. Moreover, the faulty Window System also caused damages that were discovered throughout the coverage period of the Landmark policies.

- 15 -

consistent with what was reported to us from tenants, consistent with the photographs we saw of water leakage." Id. at 11 (Trial Tr. at 758). Regarding water intrusion, Mr. Baker testified that with 100 percent of the windows he tested, "water stayed on the sill, but on 28 percent of them it actually leaked into the building. . . . 28 percent, water found a path - because as the water built up, water found a path into the building and dripped inside the building. Almost a third." Id. at 33 (Trial Tr. Vol. 6 at 846); (see also Doc. 162-8 at 14 (Trial Tr. Vol. 8 at 1019 ("Twenty-eight percent of the openings tested . . . - water was not contained within the intermediate horizontal member and leaked into the building and was visible in the building. . . . 28 percent . . actually physically leaked physical water into the building.")).[12] According to Mr. Baker, repairing the building envelope was "fantastically simple. . . . That's what is going to stop the water leakage, build [the Window System] the way it was originally intended, originally designed to. This wasn't a complicated problem or complicated to fix. It's build it the way it was designed, intended and tested." (Doc. 168-2 at 34 (Trial Tr. Vol. 6 at 850-51)).

Charles R. Warden, the chief maintenance engineer for the Project who worked for the company responsible for maintaining the Building, (Doc. 160 at 5)[,] . . . identified the images in photographs as water leaks and "[s]aturated ceiling tile" in numerous locations in the building on different floors, and testified regarding damaged ceiling tiles and papers. (Doc. 160-1 at 116-19, 123-24 (Trial Tr. Vol. 10 at 1261-64; 1266-68, 1271, 1274-75, 1292-93)). He states that the stained ceiling tiles were replaced "many times." Id. at 117, 119 (Vol 10 at 1268, 1274-75).

Steven Main, a consultant with Rolland, DelValle & Bradley ("RDB") and assistant project manager who compiled the Punch List of "deficient and incomplete work," testified that he observed water entering the building "between the concrete curb and the framed exterior" in three locations in the penthouse and that the "wall was saturated with water." (Doc. 60-1 at 177 (Trial Tr. Vol. 11 at 1405)); (see Doc. 24-1 at 18-19). In other locations, Mr. Main observed either in person or in photographs "water standing in the ceiling tiles in the southwest corner of the butler's pantry of the . . . tenant build-out. And moisture could also be felt in the fabric

---

[12] Mr. Baker tested 356 windows. (Doc. 162-2 at 14 (Trial Tr. Vol. 8 at 1019)).

wallcoverings in that area"; stained ceiling tiles; "ponding water on the carpet" of an occupied space in the building; and "[w]ater staining on the ceiling tile above and drips of water forming underneath the upper mullion of the windows." (Doc. 160-1 at 177-79 (Trial Tr. Vol. 11 at 1406-07, 1410, 1412-14)).

Paul J. Lunetta, vice president and treasurer of RAP, testified regarding an email from a tenant about a leak on the 12th floor of the building expressing concern about possible damage to carpeting and furniture. (Doc. 160-1 at 346 (Trial Tr. Vol. 21 at 2786)). Trial exhibits include numerous e-mails discussing water intrusion and damage and staining to ceiling tiles, wet walls with mold growth, water ponding on window sills, water entering through the window system, saturated carpet, and "[t]he file 'TS Fay Water Intrusion Report' referenc[ing] the 80 pages (bookmarks show details) in the pdf named 'water damage.'" (Doc. 121-2 at 1-56). The record also includes photographs depicting instances of water intrusion and water damage throughout the building, including photographs of water damage near windows. (Doc. 21-3 at 1-52; Doc. 21-4 at 1-14; Doc. 21-5 at 1-7).

[Mr. Lunette also] wrote to Auchter on January 24, 2007 regarding "Water Damage" seeking to confirm that

"1) Auchter has filed a water damage claim to the TI [tenant improvement] areas with their insurance carrier and 2) That the pricing from [tenant contractor] Solutions is acceptable to Auchter. Please let me know today so that I can direct the TI Contractors to proceed if Auchter does not plan to do the work. We need to have the affected areas removed and replaced quickly to mitigate any further damage by mold growth . . . ."

(Doc. 121-7 at 24); (see also id. at 25 (January 12, 2007 Letter from Lunetta to Auchter regarding "the water intrusion issue" and his "concern[ ] over an apparent lack of urgency by Auchter in mitigating the damage that was caused by the water intrusion," recounting observing water on the ninth floor, "a rather large volume of water . . . in the middle of the 7th floor," and "standing water on the 12th and 13th floors."). Surmising that water was entering the building through the roof and the windows, Lunetta wrote in 2007 that the tenant contractor had presented change orders "to repair and replace the damaged drywall, ceiling and flooring," and that "[t]he damage to the drywall is spreading and has to be

removed immediately." Id. Mr. Lulnetta testified that rental concessions and the cost of replacement of stained ceiling tiles and wet carpet were not included in RAP's list of damages presented in the Underlying Lawsuit. (Doc. 169-6 at 10 (Trial Tr. Vol. 24 at 3091-92)); (see Doc. 24-1 at 3, 57 ("RAP is entitled to three different categories of damages: 1) repairs to the building envelope; 2) repairs or completion to deficiency items or to items on the punch list; and 3) damages for delay."). RAP's damages report included consultant costs ("all invoices for determining the cause of the water intrusion and also to determine the appropriate resolution to it."). (Doc. 168 at 12 (Trial Tr. at 2844)); (see generally Doc. 168-8 (Damages Summary submitted by RAP)).

(Doc. 216 at 10-14). From Judge Jay's Final Judgment and the unrefuted evidence

adduced in the underlying action, it is abundantly clear that there was an "occurrence"

during the coverage period. Moreover, this occurrence damaged non-defective property

beyond the scope of TSG's work. The cost to repair that work is not the relevant inquiry,

as the Final Judgment reflects that $5,000,000.00 is needed to repair the Window

System, which is required to repair the non-defective property. (Doc. 216 at 27-28).

Pursuant Carithers, this establishes the floor of established damages at nearly

$5,000,000.00.

c.   Number of Occurrences[13]

The Landmark policies provides policy limits of $1,000,000.00 per occurrence

with an aggregate cap of $2,000,000.00. (Docs. 24.6 and 24.7). The policies define an

---

[13] "It is well understood that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." Childress v. Walker, 943 F. Supp. 2d 1332, 1349 (M.D. Ala. 2013), aff'd, 554 F. App'x 834 (11th Cir. 2014) (internal quotations and citation omitted). It does not appear that Amerisure or Arch addressed Landmark's argument regarding the number of occurrences in this case and have conceded this issue.

occurrence as "an accident, [i]including continuous or repeated exposure to substantially the same general harmful conditions." Id. at 19. The term accident is not defined. Landmark takes the position that damages flowing from the improper installation of the Window System constitutes one occurrence rendering it liable for no more than $ 1,000,000.00, relying on Travelers Prop. Cas. Co. of Am. v. Cont'l Cas. Co., 226 F. Supp. 3d 1359, 1368 (N.D. Ga. 2017). Travelers held that Georgia law requires application of the "cause test" to determine that number of qualifying occurrences or accidents under the subject insurance policy. Id. (citing State Auto Prop. & Cas. Co. v. Matty, 286 Ga. 611, 611, 690 S.E.2d 614, 616 (Ga. 2010)). In Matty, the Georgia Supreme Court resolved the question of how many accidents occurred where the insured's car struck and killed a bicyclist and approximately one second later struck a second bicyclist some 95-115 feet away. Id. at 611-12. Because the car's driver did not have time to regain control of the car before striking the second bicyclist, the Court concluded that there was but one proximate, uninterrupted, and continuing cause that resulted in the damages of all the injured parties. Id. at 612-614. Consequently, the Court concluded only one accident occurred.

Travelers was confronted with interpreting the definition of occurrence identical to one present in the Landmark policies where the insured participated in the manufacture of a bottled fuel gel that resulted in multiple burn injuries to different and unrelated product users. Travelers, 226 F. Supp.3d at 1360-62. The court ultimately concluded that for purposes of coverage, there was only a single occurrence because all of injuries involved "exposure to substantially the same general harmful condition." Id. at 1368; see also Grange Mut. Cas. Co. v. Slaughter, No. 1:16-CV-03058-SCJ, 2018

- 19 -

WL 1200062, at *6 (N.D. Ga. Feb. 20, 2018) ("Under the cause theory, the number of accidents is determined by the number of causes of the injuries.") (internal quotations omitted). In this case, the Final Judgment catalogues the multitude of instances of water intrusion and the resultant damages because of the faulty Window System. As it pertains to costs of those damages and the Window System, all of those injuries are attributable to a single, repeated harmful condition, the faulty installation of the Window System.[14] Accordingly, the amount Landmark must indemnify Arch for repair of the Window System is limited to one occurrence, and thus, $1,000,000.00.

### d.     Punch List and Delay Damages

Landmark, like Amerisure, seeks a declaration that it cannot be held liable for Punch List and Delay Damages. The Court does not need to make this determination at this time in light of the fact that Landmark's policy limits are exhausted with respect to the repair of the Window System.

### e.     Costs of Defense and Indemnity

On September 27, 2018, the Court ordered that Landmark maintained the primary duty to defendant Auchter in the underlying state court action. (Doc. 267 at 28). As a result, the Court required Landmark to reimburse Amerisure the $1,208,593.34 that Amerisure paid in the defense of Auchter. Id. Landmark seeks to have this amount credited toward any obligation it has to indemnify Arch by relying on cases outside of both Florida and Georgia and which deal with circumstances materially distinct from this case. Under the heading "Supplementary Payments—Coverages A and B," the

---

[14] Arch appears to concede as much. (Doc. 263 at 7 ("The 'occurrence' is TSG's faulty workmanship . . . .")). (Doc. 263 at 7). Of course, Arch's concession does not bind Amerisure.

Landmark policies provide that Landmark will pay, among other things, all the expenses Landmark incurs with respective to any suit against the insured. (See Docs. 24.6 and 24.7 at 13). Both TSG and Auchter were insureds. Furthermore, the policies provide that "these payments will not reduce the limits of insurance." Id. As an additional insured, Auchter was covered under this provision and the defense costs owed to Amerisure for Auchter's defense do not diminish the policy limits. Even had Auchter been an indemnitee, the policies state that payments on behalf of the defense of indemnitees will not be deemed to be damages for property damage "and will not reduce the limits of insurance." Therefore, Landmark is not entitled to offset the amount owed for its duty to indemnify Arch by the amounts it owes Amerisure for the defense of Auchter.

## V. AMERISURE'S MOTION FOR THE ENTRY OF A PARTIAL FINAL SUMMARY JUDGMENT AGAINST LANDMARK (DOC. 271)

Amerisure seeks to have the Court enter partial final summary judgment pertaining to Landmark's previously established duty to defend Auchter. (Doc. 271 at 3). As Landmark noted in its opposition, the Court was concerned about resolving the issues in a piecemeal fashion, especially owing to the existence of multiple parties asserting various claims, counterclaims, and cross claims. Landmark's obligations have now been determined and its policy limits exhausted, however, the Court will delay entering judgment until the parties file a joint statement of the case as the Court previously said it would require following the conclusion of dispositive motion practice. (Doc. 216 at 59 n.18).

## VI.    CONCLUSION

It appears that in light of this Order and those previously entered by the Court, Landmark and Amerisure's policies will be exhausted by indemnifying Arch for the repair of the Window System. Additionally, the Court previously determined that Landmark had the primary duty to defend Auchter in the underlying state case. Dispositive motion practice has concluded, and the Court will require the parties to file a joint status report as to what, if any, claims remain. At this time the Court will also deny without prejudice the Amerisure's Motion to Bar the Expert Opinions and Testimony of Steven C. Shimp at Trial (Doc. 246); Landmark and Amerisure's request to have the Court find that they cannot be held liable for Punch List and Delay Damages; and Amerisure's Objections to the Magistrate Judge's Non-Dispositive Order (Doc. 257) as the need to resolve these motions and objection appears to be mooted. If necessary, the Court will allow the parties to renew their motions and responses relating to Mr. Shimp's testimony, the Punch List and Delay Damages, and the Magistrate Judge's Non-Dispositive Order. However, the Court will not allow new arguments that could have been previously presented.

Accordingly, after due consideration, it is

**ORDERED:**

1.    Amerisure Insurance Company and Amerisure Mutual Insurance Company's Motion for Reconsideration and Reversal of Order on Cross Motions for Partial Summary Judgment [Doc. 216] (Doc. 224) is **DENIED**.

2. Amerisure's Motion for Partial Summary Judgment against Landmark American Insurance Company (Doc. 247) is **GRANTED to the extent** that Landmark has the duty to indemnify Arch and that duty is primary.

3. Landmark's Motion for Summary Judgment on the Duty to Defend and the Duty to Indemnify related to the Equitable Exception (Doc. 249) is **DENIED**.

4. Landmark American Insurance Company's Motion for Summary Judgment on the Duty to Indemnify (Doc. 250) is **DENIED in part and GRANTED in part**.

    a. The Motion is **GRANTED to the extent** that the damages and injuries flowing from the faulty installation constitutes one occurrence, limiting Landmark's duty to indemnify Arch to $1,000,000.00.

    b. The Motion's request for the Court to determine Landmark's liability as to the Punch List and Delay Damages is **DENIED without prejudice**.

    c. The Motion is **DENIED** in all other respects.

5. Amerisure's Motion to Bar the Expert Opinions and Testimony of Steven C. Shimp at Trial (Doc. 246) is **DENIED without prejudice**.

6. Amerisure's Motion for Partial Summary Judgment against Arch Insurance Company ("Arch") regarding Claims for Insurance Coverage for the "Punch List" and "Delay Damage" Components of the Final Judgment (Doc. 248) is **DENIED without prejudice**.

7. Amerisure's Objections to the Magistrate Judge's Non-Dispositive Order (Doc. 257) is **DENIED without prejudice**.

8.   Amerisure's Motion for the Entry of a Partial Final Summary Judgment against Landmark (Doc. 271) is **GRANTED to the extent** that the Court will enter judgement in favor of Amerisure and against Landmark following review of the parties forthcoming joint status report.

9.   On or before **March 4, 2019**, the parties shall confer in person, via telephone, or video conferencing to decide what, if any, issues remain for this Court's consideration. On or before **March 11, 2019**, the parties shall file a joint notice to the Court as to the status of this case. The Clerk of the Court shall administratively close this case until further order of the Court.

**DONE** and **ORDERED** in Jacksonville, Florida this ___14th___ day of February, 2019.

BRIAN J. DAVIS
United States District Judge

/p
2
Copies furnished to:

Counsel of Record
Unrepresented Parties

- 24 -